CHARLES C. WHEELER *v.* SAN FRANCISCO AND ALAMEDA RAILROAD COMPANY.

RAILROAD COMPANIES.—Incorporated railroad companies may contract to carry passengers and freight beyond their own routes.

CONTRACTS OF RAILROAD COMPANIES AS COMMON CARRIERS.—Railroad companies, as common carriers, may make valid contracts to carry passengers or freight beyond the limits of their own road, either by land or water, and thus become liable for the acts and neglects of other carriers in no sense under their control.

RAILROAD COMPANY A COMMON CARRIER.—If a railroad company holds itself out as a common carrier to a point beyond the termination of its road, then it is a common carrier for the whole distance, and if it professes to contract and does contract with and carry persons generally the entire distance, it must treat all alike, and contract with and carry all who apply. This principle applies to the carriage of goods as well as passengers.

RAILROADS MAY OWN STEAMBOATS.—Railroad companies have the right to own and control steamboats for the purpose of transporting their freight and passengers across navigable waters on the line and constituting a part of their routes, and those lying at the end of their roads, separating them from the ostensible and substantial termini of their routes.

DUTY OF RAILROAD COMPANIES TO USE ALL PERSONS ALIKE.—If a railroad company holds itself out as a common carrier of passengers by steamboat, across a navigable bay at the end of its route, and does contract generally with persons to convey them over its road and across the bay, then it is its duty to contract with and convey over the road and bay all persons who apply and tender the usual price.

APPEAL from the District Court, Third Judicial District, Alameda County.

The complaint contained the following allegations in addition to those copied into the opinion:

That the plaintiff was, at the day named, to wit: on or

about the 21st day of September, A. D. 1865, a resident of said County of Alameda, and doing business in said City of San Francisco, and theretofore in the habit and accustomed to make trips back and forth daily on said railroad and steamboat, and that on the day last named he entered the defendant's cars at a regular station on said route, known as the "Alameda Station," and while said cars were there on a regular trip for the purpose of receiving freight and passengers to San Francisco, and that he entered the cars in good faith as a passenger, for the purpose of being conveyed to said City of San Francisco, in the usual course of his business in said city, and that he tendered the usual rates of fare and offered to pay the same, being the same sum charged for other passengers, to wit: the sum of twenty-five cents, and requested defendant to carry him to San Francisco as such passenger. Yet said defendant, not regarding its duty, but intending to injure this plaintiff in this behalf, refused to accept said fare, and that after plaintiff had proceeded on said cars to said steamer, on his journey as aforesaid, and while he was on board of said steamer as such passenger, and while he was still yet ready to pay his full fare, and while he had fully conformed to all the rules and regulations of defendant in the premises, and was still so conforming and conducting himself in a proper manner, and while there was ample room on board said steamer, and while other passengers were received as passengers on board thereof, said defendant, by its agents, employés and servants, did, wrongfully, unlawfully, and with force and arms, and against the will of this plaintiff, seize hold of and expel, eject and remove him from on board of said steamer to said wharf, and there held and detained him until said steamer left said wharf for San Francisco, whither she proceeded with her freight and passengers, and defendant then and there refused to permit plaintiff to travel on said line.

The other facts are stated in the opinion of the Court.

*E. D. Wheeler,* and *R. A. Redman,* for Appellant.

*The defendant was a common carrier of freight and passengers for hire, on the railroad and steamboat.*

It is the duty of common carriers to carry all passengers who offer themselves and are ready to pay for their transportation, and who conduct themselves with propriety and decorum. (Story on Bail., Sec. 590 ; and *Zabriskie* v. *Cleaveland*, C. & C. R. Co., 23 Howard, 400.)

The defendant had power to contract to carry beyond the terminus of its railroad. (Redfield on Railways, 284, 289 ; *Angle & Co.* v. *Miss. and Mo. R. Co.*, 9 Iowa, 494 ; *Schroeder* v. *Hudson R. R. Co.*, 5 Duer, 55.) Aside from the adjudged cases, our statute seems to settle this matter. (See 3d and 8th subdivisions of 17th Section of Act concerning Railroad Companies, Laws 1861, pp. 615, 616.)

It may be answered that defendant was incorporated for railroad purposes. But what are railroad purposes? The answer is, the carrying of freight and passengers. This was the object of the incorporation ; and whether transported along an iron bar or on a boat, the result to the corporation and to the public is the same. At all events, whether the steamboat was necessary or convenient to the business of the defendant, was a matter in the discretion of the directors. It is manifested, however, that it was both necessary and convenient and clearly within the scope of defendant's business.

*S. M. Wilson*, for Respondent.

The action is really an action on the case, and was always in that form under the common law system of pleading. (2 Chitty's Pl. 360, and note citing cases ; *Jackson* v. *Rogers*, 2 Shower, 327 ; 1 Saund. 312, *a*, note 2, citing cases.) These authorities show that this action on the case against the common carrier is upon a duty imposed by law, and that " a breach of this duty is a breach of the law, and for this breach an action lies, founded on the common law, which action wants not the aid of a contract to support it."

To determine this case we must see what the defendant is as averred in the complaint. From these we learn that the

defendant is a corporation; not only a corporation, but one of a particular kind, organized and existing under a particular law of this State, entitled "An Act to provide for the incorporation of railroad companies," etc. The action here, then, not being on a contract, but on a duty, the question occurs whether it is the duty of such a corporation to carry passengers by water in a steamboat across the Bay of San Francisco? We find no such power in the statute. But the complaint avers that the defendant has been carrying on the business of a common carrier by water as well as by land. But will this avail in the absence of a contract and in an action for nonfeasance, merely upon the ground of duty? Is it anything more than the assertion that as you have done this thing before, you must do it again? It is not the duty of a common carrier to transport goods or passengers beyond his own route in the absence of a special contract.

By the Court, SAWYER, J.:

This is an action brought against the defendant as a common carrier of passengers and freight, to recover damages sustained by plaintiff in consequence of a breach of duty on the part of defendant in refusing to carry the plaintiff across the Bay of San Francisco to the City of San Francisco, from the defendant's wharf, at the terminus of its railroad, in the County of Alameda, in a steamer under the control of defendant, which run regularly between the said points in connection with the regular trains on said railroad. The fact that said defendant was, at the time, a common carrier of passengers and freight, for hire, over the whole of said route, and the duty to carry, are alleged in broad terms. But it is also alleged that defendant is a corporation, organized and existing under the statute of the State, entitled "An Act to provide for the incorporation of railroad companies, and the management of the affairs thereof, and other matters relating thereto," approved May 20th, 1861.

7

Defendant having demurred to the complaint, on the ground that the facts stated are insufficient to constitute a cause of action, the demurrer was sustained, and judgment entered for defendant.    Plaintiff appealed.

As we understand respondent's counsel, it is conceded that the facts, broadly stated, considered literally as they appear upon the face of the complaint, are sufficient, as they undoubtedly are; but, it is claimed that, as the statute under which the corporation is formed appears on the face of the complaint, and as thereby " the character of the defendant, and its functions, and the general scope of its powers, also appear, the Court can determine, notwithstanding the other strong averments, whether the law did impose the duty on the defendant, and that the other averments will turn out to be merely conclusions of law wrongfully alleged."

The point of the demurrer is, that the defendant is a corporation for the purpose of building and operating a railroad only, with no power or authority to build, own or control a steamboat; that the acts complained of were committed on the steamboat and not on the railroad; that on that part of the line the defendant had no power to act or become liable as a common carrier; and that, as the corporation had no capacity to become a common carrier by steamboat, there could be no duty to carry the plaintiff by steamboat, and consequently no breach of duty arising out of the acts alleged in the complaint.    In short, that in consequence of a want of power to become a carrier over the part of the route traversed by steamboat, the essential facts alleged are legally impossible, and therefore cannot constitute a cause of action.    The defendant is alleged to be a common carrier of passengers and freight over this part of the line, as well as on the railroad, which is only continued to the wharf whence the steamboat starts.    But, if by the law of its organization referred to in the complaint, the defendant had no legal capacity to contract to convey passengers across the Bay of San Francisco, from the wharf of the defendant to the City of San Francisco, then the demurrer was properly sustained, notwithstanding the

averment, and this question of power is the only point to be determined.

The Act under which defendant was incorporated confers the powers generally and ordinarily conferred by similar Acts upon corporations organized to build and operate railroads in the various States of the Union, with no special restrictions affecting the question. (Laws of 1861, p. 615, Secs. 3 and 17 ; Hittell's Gen. Laws, par. 826, *et seq.*) The second subdivision of section seventeen authorizes the defendant: " To receive, hold, take, etc., as a natural person might or could do, etc., real estate and other property of every description, etc., to aid and encourage the construction, maintenance and accommodation of such railroad." And the third subdivision authorizes it : " To purchase, etc., all such lands, real estate and other property as the Directors may deem necessary and proper for the construction and maintenance of said railroad, etc., and other accommodations and purposes deemed necessary to accomplish the objects for which the corporation is created." The fifth subdivision authorizes such companies : " To construct their roads across, along or upon any stream of water, watercourses, roadstead, bay, navigable stream," etc. The sixth subdivision : " To cross, intersect, join and unite its railroad with any other railroad, either before or after constructed, etc., with necessary turnouts, etc., and other conveniences in furtherance of the objects of its connections," etc. ; and the eighth subdivision confers authority " to receive by purchase, etc., any lands or other property of any description, and to hold and convey the same in any manner the Directors may think proper, the same as natural persons might or could do, that may be necessary for the construction and maintenance of said road, etc., or for any other purpose necessary for the conveniences of such companies, in order to transact the business usual for such railroad companies."

We will first consider the question on the hypothesis that defendant's route terminates at its wharf, and not at the City of San Francisco, as its name would seem to indicate, and that it does not own the steamer running from the wharf to San

Francisco, or control that portion of the line.   On this hypothesis, the first question is, had the defendant any capacity to contract to carry passengers and freight beyond the wharf—the terminus of its line—to the City of San Francisco? It has long been settled by judicial decisions, both in England and the United States, under similar Acts, that railroad companies may contract to carry passengers and freight beyond their own routes.   So far as we are aware, with the exception of a single State, (Connecticut,) the decisions in England and the several States of the Union have been uniform in favor of the power.   Redfield, in his able work on railways, states the result of the decisions thus : " It was for many years regarded as perfectly settled law, that a common carrier, which was a corporation chartered for the purposes of transportation of goods and passengers between certain points, might enter into a valid contract to carry goods delivered to them for that purpose beyond their own limits.   Most of the American cases do not regard the accepting a parcel marked for a destination beyond the terminus of the route of the first carrier as *prima facie* evidence of an undertaking to carry through to that point.   But the English cases do so construe the implied duty resulting from the receipt.   But the cases, until a very recent one, do hold that a railroad company may assume to carry goods to any point to which their general business extends, whether within or without the particular State or country of their locality.   And it has generally been considered, both in this country and in the English Courts, that receiving goods destined beyond the terminus of the particular railway, and accepting the carriage through, and giving a ticket or check through, does import an undertaking to carry through, and that this contract is binding upon the company."   (Ib. 288.) He then refers to the single case holding a contrary doctrine, (*Hood* v. *N. Y. and N. H. R.*, 22 Conn. 502, in which there was a divided Court,) and vindicates the rule as established by the great weight of authority.   The following are some of the cases which support the rule as stated : *Muschamp* v. *L. and P. Railway*, 8 M. & W. 421 ; *Watson* v. *Ambergate, Nat.*

*and Boston Railway,* 3 Eng. L. and Eq. 497 ; *Scotthorn* v. *South Staff. Railway,* 18 Eng. L. and Eq. 553 ; *Wilson* v. *Y. N. and B. Railway,* 18 Eng. L. and Eq. 557 ; *Crouch* v. *London and N. W. R.,* 25 Eng. L. and Eq. 287 ; *Collins* v. *Bristol and Ex. R.,* 36 Eng. L. and Eq. 482 ; *Weed* v. *Sar. an Sch. R. Co.,* 19 Wend. 534 ; *Far. and Mech. Bank* v. *Champ. Trans. Co.,* 23 Vt. 186 ; *Noyes* v. *Rut. and Bur. R. Co.,* 27 Vt. 110 ; *Kyle* v. *Laurens R. Co.,* 10 Richardson, 382 ; *Angle* v. *Miss. and M. R. Co.,* 9 Iowa, 488 ; *Schroeder* v. *Hudson River R. Co.,* 5 Duer, 61 ; *Hart* v. *Res. and Sar. R. Co.,* 4 Seld. 37 ; *Fitzberg and Worces. R. Co.* v. *Hanna,* 6 Gray, 539 ; *N. Y., Alb. and Buf. Tel. Co.* v. *De Rutte,* 5 Am. Law Reg. (N. S.) 407 ; *Perkins* v. *Port., Saco and Ports. R. Co.,* 47 Maine, 573. In *Noyes* v. *R. and B. R. Co.,* Mr. Chief Justice Redfield says : " It now seems to be well settled that railroad companies, as common carriers, may make valid contracts to carry beyond the limits of their own road, either by land or water, and thus become liable for the acts and neglects of other carriers, in no sense under their control." (27 Vt. 111.)

In *Perkins* v. *P. S. and P. R. Co.,* 47 Me. 573, the contract was by a railroad company in the State of Maine, to deliver packages of goods at Bloomington, in the State of Illinois. The Court held it competent for the corporation to make such a contract. In the opinion the Court says : " Upon a careful survey of all the authorities, we are satisfied that a railroad company may be bound, by special contract, to transport persons or property beyond the line of their own road. In granting the charter, all incidental powers which are necessary to the proper and profitable exercise of those which are specially enumerated may be presumed to be conferred by implication. The business of common carriers between the different places is intimately interwoven, branching off into innumerable channels. And it is often of great public convenience, if not of absolute necessity, that several companies should combine their operations, and thus transport passengers and merchandise by a mutual arrangement over all their lines, upon one contract, for one price. In such cases each is held

liable for the whole distance. (*Fairchild* v. *Slocum*, 19 Wend.
329; *F. and W. R. Co.* v. *Hanna*, 6 Gray, 539.) And we
think a company may be bound, even without any actual
arrangement with the connecting lines, *if, by their agents,
they hold themselves out to the public as common carriers to à
place beyond the limits of their own road.*" (Page 590.)

However forcible the reasons might seem for a more limited
construction of the powers of corporations in this respect
under the ordinary Acts authorizing the organization of rail-
way companies, if the question were a new one, we should
not feel authorized to disregard such an almost unbroken
array of authorities. The interests, both of the companies
and the public, are, doubtless, also best subserved by the
construction established. With respect to the English cases,
some of the later ones might, perhaps, if necessary, have
been aided by an express provision of a statute (8 Victoria),
to which we shall have occasion to refer; but the leading case
of *Muschamp* v. *Lancaster and Preston Railroad*, and some
others, were decided before the passage of the Act referred
to; and they seem to have been decided wholly independent
of any statutory provision. In none of the American cases
does this statute appear to have been noticed.

It is insisted, however, by the respondent, that the cases of
the class cited, are all upon express contracts to carry beyond
the route of the company; that, at least, it was optional with
the parties whether to contract to carry and deliver beyond
the termini of their respective roads; that they did so
expressly contract, and thereby voluntarily assumed the lia-
bility beyond that which the law imposed on them as carriers
over their own roads; and that for this reason the cases are
not authorities in the case at bar, in which the defendant
exercised its option and refused to contract to carry beyond
its own road, or to assume responsibilities beyond those which
the law imposed on it as a carrier to the end of its route.
But we have seen that it was competent for the defendant to
contract in the character of a common carrier of passengers
and freight beyond the terminus of the road. And the com-

plaint avers that the defendant is a common carrier over the whole line. If the defendant is competent to contract for the whole distance in the character of a common carrier, without reference to the termination of its road, and holds itself out as a common carrier, ready to contract with all persons but the plaintiff, and does contract generally with all who offer to traverse the route with them ; then it is a common carrier for the whole distance under the law, without reference to the termination of its road ; and it is its duty, as such carrier, to contract with and convey the plaintiff with the rest. The allegation of the complaint is that defendant is such carrier. The allegation is sufficient, if the proof should be sufficient to sustain it. And the allegation, if the fact alleged is legally possible, is admitted by the demurrer. The allegation also is, that the plaintiff entered upon the cars of the defendant, upon a regular train, at a regular station for the reception of passengers, to be carried to San Francisco, and there tendered the regular fare for the entire distance, and that the defendant refused to take him, and when at the end of the railroad ejected him from the steamboat which would otherwise have carried him, and which did, on the same trip, carry the other passengers to the end of the line. The precise point was determined in *Crouch* v. *London and N. W. Railway*, 25 L. and Eq. R., 287. In that case there were two causes of action alleged in separate counts—one for breach of duty in refusing to carry, as a common carrier of goods and chattels, for hire, a package of goods for plaintiff, from Euston Square Station, Middlesex County, England, to Glasgow, in Scotland ; and the other in refusing to convey from the same station to Sheffield, in the County of York, England. The defendant's line toward Glasgow ended at Preston, at which place it connected with another and different road—the Lancaster and Carlisle Railway, which extended to Carlisle, where it connected with still another road—the Caledonian Railway, which was nearly all in Scotland, and extended to Glasgow. On the route to Sheffield the defendant's line ended at Rugby, at which point it connected with the Midland Railway, which extended to

Sheffield. These roads were all owned by different companies organized under different Acts of Parliament. There was an arrangement, however, between the defendant and the other companies by which the defendant loaded its own van and locked it; and it passed through the entire distance over the other roads to Glasgow and Sheffield respectively, the several companies furnishing the steam power and management on their own roads, conveying it through to its destination for the defendant. The plaintiff himself was a common carrier of packages, which he collected in small parcels from his customers in London and packed into one or more large parcels, called "packed parcels," and sent them to Glasgow, Sheffield and other points, to his local agents, to be distributed to the parties to whom the several smaller parcels were respectively addressed, he depending upon and using the railways of defendant and other companies in the ordinary course of his business as common carrier of parcels, for the purpose of forwarding the goods to his local offices. The officers of the defendant made an order upon their minutes directing that "packed parcels" should be received or invoiced to the termini of their lines only, and gave instructions accordingly to their servants, of which order plaintiff had notice. They had not, however, at the time when the breach of duty complained of occurred, enforced the order with reference to merchants, traders and parties other than the plaintiff, who was himself sending such packages in the exercise of his own ordinary business of common carrier. Under these circumstances, in the ordinary course of his business, the plaintiff tendered a "packed parcel" to the defendant at its station, at Euston Square, London, in time for the regular mail train of defendant for Sheffield; also a similar package in time for the train for Glasgow, at the same time tendering the ordinary charges through, and defendant refused to receive them on the ground that they were "packed parcels." The plaintiff then paid the charges to the end of the routes of the defendant, and they were received and forwarded to the end of their roads, and delivered to the connecting companies, who transmitted them

on to their destination, where they arrived in due time by
that mode of carriage; but the package for Sheffield arrived
some seven, and the package for Glasgow some twenty, hours
later than they would have done had they been received
and booked, and had defendant undertaken to carry for the
entire route. The expense by the several transfers was also
increased. The defendant at the same time, and by the same
train, received, carried and delivered "packed parcels" for
other parties. The question was whether defendant was
liable for breach of duty in refusing to carry beyond the ter-
mini of its own lines. The fifty-eighth and fifty-ninth pleas
raised the question whether the defendant could become a
common carrier beyond the limits of its own line, on the
ground that anything beyond such limits would be *ultra vires*.
But a demurrer having been interposed, so little confidence
had counsel in these pleas that they were abandoned by them
on the argument. (25 E. L. and Eq., 289.) It was then
contended that the defendant was a common carrier only to
the extent of its own line for ordinary parcels. Secondly,
that at all events it was a common carrier only to the extent
of its own line with respect to "packed parcels." Thirdly,
that as Glasgow is beyond the realm, the defendant could not
be a common carrier, nor bound to convey from London to
Glasgow in the sense of the averment in the declaration.
The Court have no difficulty with the first two propositions,
and only spend time in discussing the last. Mr. Chief Justice
Jervis says: "I am of opinion that the plaintiff is entitled to
our judgment. The effect of the eighty-sixth, eighty-seventh
and eighty-ninth sections of the Railways Clauses Act is to
put this company, the defendants, on the footing of common
carriers, and the question is, whether, viewing them in that
character, they are liable in the present form of action. I
think they are liable on the first count, that, holding them-
selves out as common carriers in England, and professing as
such to carry from London to Glasgow, they are liable for

refusing to accept goods to be carried from the one terminus to the other. It is not denied now, although the authorities upon the subject are not numerous, that if a person holds himself out as a common carrier from London to Oxford, both termini being within the realm, he is bound to carry, within reasonable limits, all goods that may be tendered to him to be carried from London to Oxford. The only question on this part of the case is, whether that rule applies where one of the termini is a place out of England; and I think it does. If a person who holds himself out as a common carrier accepts goods, the common law of England, that is, the law founded on the custom of the realm, engrafts on such acceptance a contract to take and safely carry the goods, and to deliver them as uninsured, with certain exceptions, viz.: the acts of God and the King's enemies.

"It was admitted during the argument, and could not be denied, that if the defendants had accepted the goods in London, the common law would have engrafted on their contract an obligation to carry them to Glasgow, subject to the liability I have mentioned. The case of *Morse* v. *Slue* would seem to be an authority to that extent, and the commentaries on that case seem to put the matter beyond doubt. Then, if it is admitted that when once they have held themselves out as common carriers, there is engrafted on their acceptance of the goods the common law liability to carry, even if they are to carry beyond the realm, it would seem also that they are subject to the other part of the common law liability, namely: to accept within reasonable limits all goods that may be tendered to them to carry. If, therefore, being carriers within the realm, they are bound to take the goods offered to them to be carried within the realm, it follows that if they profess to be carriers beyond the realm, being themselves at the time they so profess within the realm, they are bound to accept and to carry goods beyond the realm upon the same terms on which they profess to contract. On the first point, therefore, I am clearly of opinion that the count is good which charges them with that liability, and that they are liable for their breach of

duty in refusing to carry, having held themselves out as common carriers, and professed to carry goods for all persons to Glasgow.

"The second point, that they were not carriers to Sheffield, is disposed of by the evidence, which shows that they were carriers not only from London to Rugby, but on to Sheffield. They are also carriers to Sheffield of packed parcels. Their practice is to carry packed parcels in every case except for the plaintiff. Although it is true that their liability rests on the professions which they hold out, and as found in the case, that they have given directions that they would only carry packed parcels to the terminus of their own line, still, their uniform course of conduct and practice with regard to the rest of the world has been in direct contradiction to these directions. They do carry packed parcels to Sheffield, and the law will not allow them to say, 'We will, in fact, carry for ninety-nine of the public out of a hundred to Sheffield, and for the hundredth we will only carry to Rugby.' They are common carriers and must adopt the same course of practice to all; and it being found in the case that it was their habit to carry packed parcels for everybody but the plaintiff, they must act with the same justice to him as to the rest of the world." (Ib. 298.)

The learned Chief Justice refers to the eighty-sixth, eighty-seventh and eighty-ninth sections of the Act of 8th Victoria, before mentioned in this opinion. We have examined those provisions to see what bearing they have upon the case. The eighty-sixth section contains substantially the same provision as the ninth subdivision of section seventeen of our Railway Act, before cited. The eighty-seventh section authorizes a railway company to contract with any other railway company for the passage of its engines, coaches, wagons or other carriages over the road of such other company upon such terms as may be mutually agreed upon by the contracting parties. The eighty-ninth section simply provides that railway companies shall not be subjected to other or greater liabilities than were imposed on common carriers by the common

law.   (Stats. 8 Victoria, 124, Ch. XX., Secs. 86, 87, 89, Lond. Law Jour., 1845.)   But, as has been before remarked, it was decided in England before the passage of this Act, and apparently without reference to any express statutory provisions on the subject, that railway companies could render themselves liable by contract to carry beyond the termini of their roads—that the capacity to make such contracts existed. On this point, then, the statute could have added no new power.   The most that could be claimed for the eighty-seventh section as to this point, if it were necessary to invoke it, is, that it is applicable to railways within the realm, and that, to that extent, a power in railway companies to contract beyond their own lines may be implied from the express authority to contract with other companies to run their carriages over the road of such other company.   And possibly as much may be inferred from the authority found in our Act for one company to unite its road with any other railroad.   It may, however, be argued with equal plausibility, that the power to contract to carry beyond the line of any company having been before established by judicial decision under the general powers conferred by the statutes as they then stood, the power contained in the eighty-seventh section was given to facilitate and encourage the exercise of the other power which already existed, and thereby secure greater expedition in the transaction of business, and greatly subserve the interest of both railway companies and the public.

We have already seen that the power in a railroad corporation to contract to carry beyond the terminus of its own road is established in this country by an almost unbroken chain of decisions. · In *Willey* v. *West Cornwall Railway*, (a late English case cited by Redfield from 30 Law Times, 261,) it is stated to be " also said that the company are as much bound by contract to carry beyond their own route, where the transportation *is partly by water*, as if it were all by rail, and that the company cannot defend upon the ground that a contract to carry beyond their own route is *ultra vires.*"   (Red. on Rail. 287, note.)   The case is not accessible in any other form,

and is therefore cited as stated in Redfield's note. 'This is in consonance with the principle announced in *Noyes* v. *R. and B. R. Co.*, 27 Vt. 111, before cited, where the Chief Justice says : " It seems to be now settled that railroad companies, as common carriers, may make valid contracts to carry beyond the limits of their own road, *either by land or water*, and thus become liable for the acts and neglects of other carriers in no sense under their control." And this result also necessarily follows from the principles adopted in all the other cases.

· This power to make a contract with one party to convey beyond the terminus of the road being established, it follows, that any number of such contracts may be made with other parties, and that the corporation making them may, by contracting and holding itself out as ready to contract generally with all parties standing in the same relation to it, and by its general course of business become a common carrier beyond its own line. The principle established by the case of *Crouch* v. *N. W. Railway* is, that corporations having the power to contract and become common carriers beyond their lines within the realm, have power to become such beyond the realm ; that having the capacity to contract and become common carries beyond their lines of road, they become such by holding themselves out to be common carriers, and that when the common law liability to carry both within and beyond the realm once attaches by reason of such holding out, they are also subject to the other part of the common law liability, namely, to accept, within reasonable limits, all goods that may be tendered to them. In the language of the Chief Justice before cited : " If, therefore, being carriers within the realm, they are bound to take the goods offered to them to be carried within the realm, it follows that if they profess to be carriers beyond the realm, being themselves at the time they so profess within the realm, they are bound to accept and to carry goods beyond the realm upon the terms they profess to contract." (25 E. L. and Eq. 298.) The principles, of course, apply to carriers of passengers as well as to carriers of goods.

Upon the authorities cited and principles stated the defend-

ant in this case had power to contract, and to incur the duties and responsibilities of a common carrier of freight and passengers for hire over the entire line described in the complaint, irrespective of the question as to whether it legally owned or controlled the steamer by means of which a portion of the carriage was to be effected. The averment, then, "that defendant was a common carrier of such freight and passengers for hire on said railroad and steamboat," is the averment of a fact possible in law as well as in fact, and the fact averred is admitted by the demurrer.

But it is alleged that said defendant "was the owner and proprietor, and had under its management, direction and control a certain railroad, together with the tracks, cars, locomotives and other appurtenances thereto belonging, and was also the owner and had under its control, management and direction a certain steamboat known as and called by the name 'Sacramento;' that said railroad ran from the wharf of said company, on the east side of the Bay of San Francisco, in the County of Alameda aforesaid, and extended to the interior of said county to a place known as 'Haywards,' a distance of some sixteen miles or thereabouts; that said steamer, under the management and control of defendant, connected with said railroad at said wharf for the purpose of carrying freight and passengers to and from San Francisco on the west side of said bay, forming one continuous line of railway and steamboat transportation to and from the places above named and intermediate stations on the route of said road, carrying thereupon freight and passengers for hire, and that defendant was a common carrier of such freight and passengers for hire on said railroad and steamboat." And it is insisted by the appellant that the ownership and control of the whole line, including the steamer, is, or may be, under the law strictly within the route and powers of the defendant as a railroad company, by the express terms of section seventeen of the statute under which it is organized. That the steamer may be and is a part of the "other property of any description" which the defendant is authorized "to hold" for "any other purpose necessary for

the conveniences of such companies, in order to transact the business usual for such railroad companies."

We all know, as a part of the general geography of the country, that in constructing railways large and navigable rivers, creeks, bays and arms of the sea are, and must of necessity often be crossed; that when the necessity arises, they are crossed sometimes by means of expensive bridges, upon which a railway track is laid, and which thus literally become a part of the railway itself; that at other times, where the waters of the river, creek, bay or arm of the sea are so broad and deep as to render bridging impracticable, or where a bridge would be too great an obstruction to navigation to render such a mode of crossing admissible, the object is effected by means of a steamboat—a steam ferry. Such instances may be found on lines, or connecting lines of railways crossing the Susquehanna, Delaware, Hudson, Ohio, Mississippi and other large and navigable rivers. Sometimes these occasions for the employment of steam ferries or bridges arise in the course of the line of the road, and sometimes at the point separating the land road from the city which is the ultimate starting point or destination of all passengers and freight which pass over it—the substantial terminus of the road. Any party who has traveled over the line of railway from the City of New York—the commercial metropolis of the nation—to the City of Washington—its Capital—has had occasion to know that there are at least three of these steam ferries, which constitute indispensable links in the line of railroad travel—one of which must be crossed at the beginning of the route, and the others on the way. Will it be pretended when such a necessity for using a steamboat upon the line of the road arises that the steam ferry is not substantially and in legal contemplation a part of the road—as much so as the bridge would be at the same point, if a bridge were practicable or otherwise admissible? That it would not be " necessary for the conveniences of such company, in order to transact the business usual for such railroad company," within the meaning of the provision of the statute? How would it

be possible to carry on the business of such railroad companies successfully, and in a manner to subserve the public interest, and fully accomplish the ends for which the corporation was created without such "conveniences?" It is manifest to us that the right to own and control steamboats for the purposes of ferriage, under such circumstances, is a necessity, and clearly within the powers conferred by the statute. Are these conveniences any the less necessary or proper because they happen to be at the end instead of in the middle of the route? Take the City of New York, for an example, the great commercial metropolis of the continent—the centre to which most of the extensive systems of railways of the country tend, and really the ultimate point upon which the vast commerce and travel passing over them is discharged. We all know it is situate on an island, and that not a railroad can enter its precincts unless over a bridge, or by means of a steam ferry. Does the railway which purports to extend to New York terminate on the opposite side of the strait, or river, or bay? Are the proper functions of the various railways, purporting to terminate at that city, properly and completely performed under the law of their creation, when their myriads of passengers and millions of tons of freight are poured out of their cars on the banks of the river, strait, or bay, opposite New York, in sight only of the promised land? We think not, and that the full performance of their duties to the public requires that they should own and control, not such conveniences merely, but absolute necessities, as steamboats for ferrying over their passengers and freight. In no other way can the public interests be adequately subserved, and the objects of the creation of such corporations be completely accomplished. It is one thing to build and own a line of steamers to some foreign country, or some distant port, carrying on a wholly distinct and independent business entirely foreign to the objects of a railroad corporation, which might just as well, and a great deal better, be transacted by some other company organized for the purpose; and quite another, to own and control a steamboat for crossing rivers and bays which lay in the line

of the road, and the use of which is convenient, proper and necessary to a successful accomplishment of the objects for which the road is built and operated.   The cases cited by the respondent are of the first class, and were mostly brought by stockholders to restrain the directors from misappropriating the funds of the corporation to objects not within the scope of its powers, and not actions by third parties against the corporation for breaches of contracts or duties.   They do not, therefore, conflict with the views we have suggested.

We all know, also, that the City of San Francisco is situate something like New York, and wholly inaccessible to any railroad except from the south, without making a detour of one hundred miles or more, or the use of some means of transportation across the bay by water.   This particular fact is not set out in the pleadings, but it may be hypothetically assumed for the purposes of argument and illustration.   If this be so, and it is possible to be so, it may be convenient and necessary for a railroad from the north, northeast, or east, designed to terminate at San Francisco—the commercial metropolis of the Pacific coast—to own and control a steam ferry to facilitate the legitimate ordinary business of the company, and subserve those public interests which it was contemplated would be promoted when the Act under which the defendant is organized was passed.   The Act, as we have seen, authorizes companies organized under it " to construct their roads across * * * any roadstead, bay, navigable stream," etc.   (Sec. 17, Sub. 5th.)   It may be that the waters of the Bay of San Francisco are too deep to admit of bridging, or construction of a road, literally so called, or that the interests of navigation would render such a proceeding inadmissible.   In such event the only practicable mode of crossing and connecting the road with its ostensible and substantial terminus, the City of San Francisco, might be by means of steamboats, which might therefore be rendered necessary and convenient to the defendant in properly transacting the ordinary business for which it

was organized. If so necessary to the accomplishment of the proper objects of its creation, and the successful transaction of its ordinary business, we think the ownership and control of a steamboat for that purpose would be within the powers incidental and express conferred upon the defendant by the Act.

If the views expressed are correct, and we have no doubt they are, it follows that the facts alleged as to the control of the steamboat by defendant are legally possible, and the truth of the allegations is admitted by the demurrer. We think the Court erred in sustaining the demurrer.

Judgment reversed, with directions to the District Court to vacate the order sustaining the demurrer, and permit defendant to answer upon the usual terms.