[No. 1207.]

SUTRO TUNNEL COMPANY, a Corporation, Respond-
ent, v. SEGREGATED BELCHER MINING COM-
PANY, a Corporation, Appellant.

Statute of Limitations — Construction of Section 21. — Section 21 of
the statute of limitations applies to the class of cases mentioned in sec-
tion 32 as well as those mentioned in section 16. It applies to all causes
of action, to foreign corporations as well as individuals absent from the
state, to contracts made out of the state to be performed within it, as
well as contracts made within the state.

Contract — Arbitration — Payment of Money. — The provision in a con-
tract between two parties, whereby all disputes between them are to be
submitted to arbitration before being made the subject of litigation in
the court, is not binding upon the parties in a case where the controversy
arises out of the non-payment of a sum of money, and the contract it-
self fixes the price to be paid and the time of payment.

Contracts — Construction of. — In construing the contract made in 1866
with the contract in 1879, set forth in the opinion: Held, that the cove-
nants in relation to the price to be advanced for the construction of the
tunnel are embodied in the agreement of 1879, and can be enforced with-
out reference to the contract of 1866.

Mining Corporation — Ultra Vires — Construction of a Tunnel —
Incidental Power — Advancing Money. — A contract made by a min-
ing corporation to advance a specified sum of money for the construction
of a tunnel to drain its mine, etc., is not ultra vires. Such contracts
come within the implied or incidental powers of the corporation.

Contract — Payment of Money — Estoppel. — Appellant executed a con-
tract, and bound itself to pay a certain sum per foot for the construction
of a tunnel: Held, that it could not avoid this contract by showing that
the tunnel could have been or was constructed for a less sum per foot.

Interest — Damages — Breach of Contract — Place of Performance.
— In a case where interest is given as damages for the breach of a con-
tract, the rate of interest allowed by the laws of the state where the
contract is to be performed should govern.

Appeal from the District Court of the First Judicial District,
Storey County.

The facts are stated in the opinion.

B. C. Whitman, for Appellant:

I. If respondent ever had any cause of action against appel-
lant, the same is barred. (Stat. 1861, 26, 40; 1867, 85.)

II. Respondent was bound to arbitrate, or to seek to arbitrate, before bringing suit. (Contract, article 15; 1 Comp. L. 1426; *President* v. *Penn. C. Co.*, 50 N.Y. 250; *Holmes* v. *Richet*, 56 Cal. 307;[1] *Old Saucelito L. & D. Co.* v. *Commercial U. A. Co.*, 66 Cal. 253.)

III. The contract of 1879 is so inextricably mixed with the agreement of March, 1866, that it cannot stand without it. If this latter falls, the entire contract fails. The agreement of 1866 was never a valid one, because based upon a law (Stat. 1864-5, 128) which was an unconstitutional special grant. (Const., art. 4, sec. 21.) The only inference to be drawn from the preamble of the contract of 1879, and the agreement itself, is that the Sutro Tunnel Company therein named was a corporation. If so, it was an unconstitutional creation. (Const., art. 8, sec. 1; *State* v. *Tollroad Co.*, 10 Nev. 161.)

IV. Appellant has no power, under its articles of incorporation, to advance to respondent any money for the construction of the tunnel. This so-called " advance " was an actual gift,—a possible loan. It was never to be repaid, nor in any manner recouped, unless appellant extracted ore in quantities sufficient to absorb in toll or royalty the moneys so advanced, and then without interest. The loan was immediate; its repayment too remote and speculative to form the basis of a reasonable contract, even between individuals.

The articles of incorporation of appellant define and bound its powers; they are its charter, and by such charter appellant is circumscribed. (Green's Brice's Ultra Vires, 610; Ang. & A. on Corp., sec. 256; *Davis* v. *Old Colony R. R. Co.*, 131 Mass. 258,[2] and authorities there cited.)

*M. N. Stone*, for Respondent:

I. Appellant, being a foreign corporation, cannot plead the statute of limitations. (*Olcott* v. *Tioga R. R. Co.*, 20 N. Y. 210;[3] *Robinson* v. *Imperial S. M. Co.*, 5 Nev. 74; *Barstow* v. *Union Con. S. M. Co.*, 10 Nev. 386;[4] *State* v. *C. P. R. R.*, 10 Nev. 81.)

No distinction exists between contracts made in the state and obligations incurred out of the state by non-residents thereof. (*Ruggles* v. *Keeler*, 3 Johns. N. Y. 263;[5] *Olcott* v. *Tioga R. R. Co.*, 20 N. Y. 223;[6] *Carpenter* v. *Wells*, 21 Barb. 594; *Guns* v. *Frank*, 36 Barb. 320; *Power* v. *Hathaway*, 43 Barb. 214; *Bower* v. *Henshaw*, 56 Miss. 619.)

1  38 Am. Rep. 54.        2  41 Am. Rep. 221.        3  75 Am. Dec. 393.
4  49 Am. Dec. 705.        5  3 Am. Dec. 482.        6  75 Am. Dec. 353.

II.  The parties having fixed the amount to be paid, and the time it should be paid or advanced to respondent, the provisions in the fifteenth article for arbitration will not be regarded as of any binding force by the courts.  (*Rowe* v. *Williams*, 97 Mass. 164; *Tobey* v. *County of Bristol*, 3 Story, 800; 1 Ben. F. In. Cases, 118–124; Story's Eq., sec. 1457; *Wood* v. *Humphrey*, 114 Mass. 185; *Mentz* v. *Armenia F. In. Co.*, 79 Pa. St. 478;[1] *Leonard* v. *House*, 15 Ga. 473; *Haggart* v. *Morgan*, 5 N. Y. 427;[2] *Hurst* v. *Litchfield*, 39 N. Y. 377.)

III.  After the lateral tunnel was fully completed, nothing in the contract remained executory, so far as respondent was concerned, and the benefit thereof being received by appellant, nothing remained for it to perform except to pay the stipulated price for the work.  (*Bissel* v. *Mich. S. & N. & I. R. R. Co.*, 22 N. Y. 262; *Ross* v. *Rossie Lead M. Co.*, 5 Hill, 137; *Silver Lake Bank* v. *North*, 4 Johns. Ch. 370.)

IV.  The running of a tunnel for mining and drainage purpose is often "essential," and is always one of the "ordinary" affairs of mining corporations. . If the power to make such contracts is not expressly conferred by the statute, it is to be implied from the purposes of the incorporation, and the nature of the business to be engaged in by it.  (Green's Brice's Ultra Vires, 89, 95; *Miner's Ditch Co.* v. *Zellerbach*, 37 Cal. 578;[3] *Union Water Co.* v. *Murphy's Flat Flume Co.*, 22 Cal. 620; *Brown* v. *Winnisimmet Co.*, 11 Allen (Mass.), 326; *California State T. Co.* v. *Alta F. Co.*, 22 Cal. 428.)

By the Court, HAWLEY, J.:

On the twenty-sixth day of March, 1866, an agreement was entered into between the trustees of the Sutro Tunnel Company, an association then existing under the laws of this state, it being the predecessor in interest of the present corporation, respondent herein, and the Gould & Curry Silver Mining Company, then a mining corporation, with reference to the construction of the Sutro tunnel, under the act of the legislature of this state, approved February 4, 1865 (Stat. 1864–65, 128), and the royalty to be paid by the mining corporation for the extraction of ore after the drainage of its mine by the tunnel.

On the twenty-ninth day of March, 1879, the parties to this

1  21 Am. Rep. 80.       2  55 Am. Dec. 350.       3  99 Am. Dec. 300.

suit, in the city of San Francisco, state of California, made and entered into an agreement, which recites that the agreement, dated March 26, 1866, "between the said parties thereto, for the construction of a tunnel, known as the Sutro tunnel, is hereby made and constituted the agreement by and between the parties hereto, and recognized as existing and binding between the parties hereto, subject to the changes and modifications hereinafter contained, which are hereby agreed to and adopted, whether specific refererence is herein made to the portions of said agreement hereby changed and modified or not." This new agreement contains fourteen separate articles relating to the construction of lateral tunnels, drainage of the mining ground, royalty to be paid for ore extracted from appellant's mine, etc. Under the provisions of article four respondent agreed to construct a lateral tunnel from and to certain named points, of special dimensions, to be provided with a suitable drain for the flow of water coming into it from the mine owned by appellant, the said lateral tunnel to be the property of respondent. Under article six appellant "agrees to advance to said party of the first part in gold coin of the United States, on the fifth day of each and every month, seventy dollars for every linear foot of said lateral tunnel "constructed during the preceding month." It is agreed that the sum so advanced shall not constitute a direct liability against respondent, but may be discharged as provided in article seven. It is further agreed that if appellant fails to pay respondent in the manner stated, it will be liable for all direct and consequential damages resulting from such default. In article seven respondent agrees that the advances made by appellant under the provisions of article six may be repaid by appellant deducting one half the charges that may be due respondent upon each ton of ore extracted from appellant's mine until the sum so withheld shall amount to the whole sum to be advanced for the construction of the tunnel. It does not appear that any ore was extracted from appellant's mine after the execution of the contract.

This action was brought to recover the amount due for the construction of one hundred and seventy-one linear feet of said lateral tunnel, and for the consequential damages resulting from the non-payment of the same. Appellant and respondent

are corporations organized and existing under, and by virtue of, the laws of the state of California.

1. The first question to be considered involves a construction of the statute of limitations. (1 Comp. Laws, 1016–1048.) Can a foreign corporation, in a case where the contract was made out of this state, plead the provisions of this statute? Does section 21 of the statute refer to the provisions of section 32 as well as to section 16? Appellant contends that the statute in question is different from that of other states; that in effect it should be classified and treated as to distinct statutes — one preceding section 32, the other including it and subsequent sections; that the latter statute is *unique* in its character, and is independent of all the provisions contained in the first statute. This position is a novel one, and has been presented in an ingenious and plausible manner; but the question arises whether it can be supported by the crucial test applied in the construction of all statutes — the *intention* of the legislature. Did the legislature intend that such a construction should be placed upon its work? Was it within the thoughts of the members of that body when enacting the original provisions in 1861, or when adopting the amendments of 1867? In considering these questions we are irresistibly led to the conclusion that such was not the intention of the legislature. When the amendments of 1867 were enacted they became a part of the law of 1861. The law thereafter, as before, was embodied in one statute upon the subject, and must be treated as an entirety. When the amendments of 1867 were made, sections 21 and 32 were both revised. The whole subject was before the legislature. It necessarily follows that if section 21 applied to section 32 in the original act, it is also applicable in the act as amended. The question then is, whether section 21 was ever intended to apply to section 32. The language of section 21 is general in its terms. There are no restrictions to any specified class of cases or causes of action.

In *Robinson* v. *Imperial Silver Min. Co.*, 5 Nev. 75, this court declared that the expression "cause of action" in section 21 includes actions concerning real estate as well as personal actions. Section 21 was inserted for the purpose of creating an exception to the general rule as to the time when the cause of action, whatever it might be, should be commenced; the exception being the absence of the defendant from the state. There

is not, in our opinion, any substantial reason why the provisions of section 21 should not be made applicable to the class of cases mentioned in section 32, as well as those mentioned in section 16. In the absence of any words in section 21 limiting or restricting its provisions to a certain class of cases, or to certain sections of the statute, we are of opinion that it was the intention of the legislature that it should apply to all causes of action; to foreign corporations, as well as individuals absent from the state; to contracts made out of the state, to be performed within it, as well as to contracts made within this state.

2. The next question presented for our determination arises under the provisions of article 15 of the first agreement, executed in March, 1866: "If any question should arise between the parties to this agreement, either in respect to the time when the mine of the party of the second part shall have been drained in accordance with the foregoing articles, and the payment of two dollars per ton for ore extracted should commence; or in respect to the amount of money at any time due or payable from the party of the second part to the parties of the first part, it is agreed that such question shall be determined by each party choosing one competent and disinterested person as an arbitrator; and in the event of disagreement between such arbitrators, they shall choose a third competent and disinterested person. The arbitrators shall be sworn, and a majority of the three may decide the disagreement between the parties hereto, and their decision shall be final."

Under this clause of the agreement, was respondent bound to arbitrate, or make an effort to arbitrate, the disagreements between it and appellant, before commencing this action? It is questionable whether this article has any application to the facts of this case. It will be observed that the agreement of 1866 is adopted "subject to the changes and modifications" contained in the agreement of 1879. The article in question related to the main tunnel, to its construction and maintenance, and to the rights and privileges of the mine-owners therein. The main tunnel was not then completed to the Comstock lode, and many questions were liable to arise as to when the tunnel should in fact drain the mines, or when the payment of royalty for ore extracted should begin; and a disagreement upon either of these questions necessarily involved the other in respect to the amount of money that might, at any time, be due or paya-

able between the parties. The differences which arose between the parties are assigned as a reason for the making of the new contract, containing modifications and changes of a substantial nature, as follows: "And whereas, both of the parties hereto are desirous of adjusting all differences existing between themselves, and of preventing a recurrence thereof in the future," etc.

Under these circumstances, it would seem that the fifteenth article of the original agreement was not applicable to the new condition of affairs under the contract of 1879. But if we concede, for the sake of the argument, that it must be considered as of binding force, what was there in dispute between these parties that required an arbitration to be made? Bear in mind that no controversy is presented in the record as to the length of the lateral tunnel, or its completion in accordance with the specifications; and the amount of money to be advanced, as well as the time of payment, is expressed in the agreement. Upon this state of facts, what could have been accomplished by arbitrators under the limited authority given them in the covenant under consideration? There was no dispute "in respect to the time when the mine" of appellant should be drained; no dispute as to when the payment "for ore extracted should commence"; and no dispute "in respect to the amount of money at any time due or payable" from appellant to respondent — within the power or province of the arbitrators to adjust even if they had been appointed. The only question in dispute as to the amount of money due arises from the contention of appellant that it was only responsible for the actual cost of the construction of the tunnel, and, as we shall have occasion hereafter to state, that contention cannot be legally sustained.

The case at bar, therefore, bears no analogy to the covenants contained in insurance policies, with reference to the mode of ascertaining the loss in case of the destruction of the property insured, or any part of it, by fire. There are other authorities which hold that if provision is made for the settlement of disputes by arbitration, in regard to the value of the work to be done or the price of materials to be purchased, where no fixed value is stated in the contract, the arbitration must be had before the action to recover the price can be maintained; but where the contract itself fixes the price to be paid and the time

of payment, courts invariably take cognizance of the action, and determine the legal disputes between the parties without regard to the clause in the contract providing for an arbitration. (See authorities cited by respondent.) This principle is recognized in *Old Saucelito L. & D. D. Co.* v. *Commercial U. A. Co.*, cited by appellant, wherein the court, upon this subject, said: " It is well settled that a general provision, that all disputes which may arise in the execution of a contract shall be decided by arbitrators, will not be allowed to deprive the courts of their jurisdiction. But the parties to a .contract may fix .on any mode they think fit to liquidate damages *in their own nature unliquidated*, and *in such case* no recovery can be had until the prescribed method has been pursued, or some valid excuse exists for not pursuing it." (66 Cal. 253.)

This is not *such a case*, and the appointment of arbitrators was not a condition precedent to be performed prior to the commencement of this action.

3. We shall not stop to inquire, in the determination of the next point presented by appellant, whether the agreement of 1866 was valid as between the original parties, or whether it was void because based upon a law (Stat. 1864–65, 128), which it is contended was an unconstitutional grant. Suppose the old agreement to have been void at the time of its execution, or if valid, that the special grant of the statute lapsed before the agreement of 1879 was made; would these facts deprive respondent of its right to maintain this action under the second agreement? We think not. Would not the new contract be binding between the parties to this action, although the old agreement might have been held ·void as between the parties thereto? Could not the ·parties to the new agreement adopt such covenants, in the other agreement, as they deemed applicable to the new, although that instrument was absolutely void between the parties to it? We think they could. Moreover, the covenants in relation to the price to be advanced for every linear foot of the lateral tunnel constructed by respondent are embodied in the new agreement, and can be enforced without reference to any of the covenants and conditions contained in the agreement of 1866.

4. We now come to the fundamental proposition: Did appellant have any authority, under its charter, to make the contract in question? Appellant is a mining corporation, organized for

the purpose of gold and silver mining in the Gold Hill mining district, in Storey County. The construction of the lateral tunnel was declared in the agreement to be a benefit to appellant in conducting its business. The tunnel, when constructed, aided appellant in draining the water from its mine, furnished it with additional facilities of ventilation, and was expected to prove beneficial to it in the transportation of its ores. To secure these supposed advantages for the more thorough development of its mine, it agreed to " advance " to respondent a specified sum of money per foot for the construction of the lateral tunnel. Was not such a contract within the legitimate scope of its business ? Is it not, at times, necessary for mining corporations to enter into contracts of a similar character? It is unnecessary to enter into a detailed statement as to the method of working mines and conducting the business of extracting ores from the lower levels of the Comstock lode. The difficulties under which the mining companies labor, in getting rid of the water, are well understood. Without a concert of action between the different mining companies, or the advantages to be obtained from a tunnel company draining the ground, it would often be extremely difficult, if not impossible, to accomplish this purpose. Under such a condition, would not one mining company have the right, under its charter, to advance money to another for aiding it in pumping out the water from its mine ? The contract is not one, as claimed by appellant, of a mining corporation agreeing to advance money, pure and simple, to a tunnel corporation solely for its use and benefit. It is a contract of a mining corporation to advance a specified sum of money, per foot, for the construction of a tunnel to drain its mine, and other purposes, as hereinafter stated, and is within the scope of its business. In making it, appellant did not exceed its chartered powers. The contract was not *ultra vires.*

The facts of this case are wholly unlike those which existed in *Davis* v. *Old Colony R. Co.,* 131 Mass. 258,[1] upon which appellant relies. There a railroad company, together with another corporation organized for the purpose of manufacturing and selling musical instruments, entered into an agreement to guarantee the payment of the expenses of a musical festival, to be held in the city of Boston, under the reasonable belief

[1]   41 Am. Rep. 221.

that the holding of the festival would be of great pecuniary benefit to the corporations by increasing their business. The court, after a careful review of numerous authorities, both in England and the United States, declared that the contract was *ultra vires*, and that no action could be maintained upon it. Why? Because, to quote the language of the court: "The holding of a world's peace jubilee and international musical festival is an enterprise wholly outside the objects for which a railroad corporation is established; and a contract to pay, or to guarantee the payment of, the expenses of such an enterprise, is neither a necessary nor an appropriate means of carrying on the business of the railroad corporation; is an application of its funds to an object unauthorized and impliedly prohibited by its charter; and is beyond its corporate powers. Such a contract cannot be held to bind the corporation by reason of the supposed benefit which it may derive from an increase of passengers over its road, upon any ground that would not hold it equally bound by a contract to partake in or guarantee the success of any enterprise that might attract population or travel to any city or town upon or near its line." In the case of the other corporation the same reason existed. "The power to manufacture and sell goods of a particular description does not include the power to partake in or to guarantee the profits of an enterprise that may be expected to increase the use of or the demand for such goods."

It is apparent that the doctrines announced in that decision are not applicable to the facts of this case. There the benefits to the corporations were wholly disconnected, remote, and foreign to the business in which they were engaged. Here the benefit to appellant is direct. The construction of the lateral tunnel, if not absolutely necessary, was certainly a convenient and appropriate means to drain its mine, and enable it to properly conduct and carry on its legitimate business of mining in a systematic and scientific manner.

In Brice's Treatise on the Doctrine of Ultra Vires, it is said that "corporations may transact, in addition to their main undertaking, all such subordinate and connected matters as are, if not essential, at least very convenient to the due prosecution of the former," and that, under many circumstances, "they are in a manner necessitated to engage in business which is not

within the mere letter of their constitution." (Green's Brice's Ultra Vires, 89.)

In applying these principles, the courts have held that a corporation, created for the purpose of mining and transportation of coal, had the power to purchase and use a steamboat for the purpose of conveying its coal to market (*Callaway M. & M. Co.* v. *Clark*, 32 Mo. 305); that a corporation, created for the purpose of raising and smelting lead ore, had power to purchase smelting-works, and assume a contract entered into by their vendors providing means for the transportation of their ores, when smelted, to market (*Moss* v. *Averell*, 10 N. Y. 455); that a corporation created for the purpose of carrying on an iron furnace is authorized to carry on a supply store in connection with that business (*Searight* v. *Payne*, 6 Lea, 283); that railroad corporations have the right to own and control steamboats for the purpose of transporting their freight and passengers across navigable waters on the line of their routes, and also at the end of their roads separating them from the substantial *termini* of their routes (*Wheeler* v. *San Francisco & A. R. Co.*, 31 Cal. 65);[1] that where power is given to a railroad corporation to transport persons and property beyond the *termini* of its road, it has authority to purchase and use a steamboat for that purpose (*Shawmut Bank* v. *Platsburg & M. R. Co.*, 31 Vt. 496); that a railroad corporation, authorized to carry passengers and transport freight beyond its own lines, and to run steamboats for that purpose, may hire, either by the trip or by the season, steamboats belonging to others, or employ such steamboats to carry passengers and freight in connection with its own railroad and business, and guarantee to the proprietors that their gross earnings for the season shall not fall below a certain sum. (*Green Bay & M. R. Co.* v. *Union Steamboat Co.*, 197 U. S. 101.)

These and numerous other kindred cases proceed upon the theory that if the contract of the corporation is reasonably confined and connected with the business in which the corporation is engaged, it comes within its implied or incidental powers. " Corporations may so far develop and extend their operations as to engage in matters not primarily contemplated by their founders, provided these matters come fairly within their scope, and provided, also, that in so developing and extending their

---

1  89 Am. Dec. 147.

undertaking, they employ direct and not indirect means."
(Green's Brice's Ultra Vires, 90.)

It will be observed, upon an examination of the cases, that
the learned justice who delivered the opinion of the court in
*Davis* v. *Old Colony R. Co.*,[1] also rendered the decision of the
court in *Green Bay & M. R. Co.* v. *Union Steamboat Co.*, *supra*.
In the latter case he said: " The general doctrine upon this
subject is now well settled. The charter of a corporation, read
in connection with the general laws applicable to it, is the
measure of its powers, and a contract manifestly beyond those
powers will not sustain an action against the corporation. But
whatever, under the charter and other general laws, reasonably
construed, may fairly be regarded as incidental to the objects
for which the corporation is created, is not to be taken as pro-
hibited."

5.  It was averred in the answer that the cost of the con-
struction of the tunnel through defendant's mining ground
should not have been, and was not, greater than forty dollars
per foot. At the trial, testimony was given to the effect that
a similar tunnel was constructed at a cost of twenty-eight dol-
lars per foot; and it is claimed that the court erred in allowing
seventy dollars per foot. This position is clearly untenable.
The contract was that appellant should advance and pay
seventy dollars for each foot of the tunnel. It could not avoid
this contract by showing that the tunnel could have been, or
was, constructed for a less sum per foot. The question as to
its actual cost was wholly immaterial. The parties fixed the
price by their contract, and, in the absence of any fraud, undue
advantage, or failure to comply with the covenants as to its
construction, are bound by the terms of the contract. We do
not believe that appellant would be willing to admit that if the
tunnel had actually cost one hundred dollars per foot to con-
struct it, that respondent could have recovered that amount
under any of the covenants in the contract. It was not
entitled to recover any more, and was not bound to take any
less, than was " nominated in the bond."

6.  Objection is made to the amount of interest allowed. It
was admitted at the trial that the legal rate of interest in Cal-
ifornia, where the contract was executed, was seven per cent
per annum, and the question is presented whether the court
erred in allowing interest at the rate of ten per cent per

annum, that being the legal rate of interest allowed by the laws of this state. The ruling of the district court was correct. The work under the contract was done and performed within this state. In a case like this, where the interest is given as damages for a breach of a contract, the rate of interest allowed by the laws of the state where the contract is to be performed should govern. (2 Pars. Cont. 585; *Goddard* v. *Foster*, 17 Wall. 143.) "It is a general rule that where the contract stipulates for interest, it is payable agreeable to the law of the place where the contract is made; but if the contract is made with reference to the laws of another state or county, and is to be performed there, the interest is to be calculated according to the laws of the place where the contract is to be performed or the money paid. The place of performance is chiefly regarded; it locates the contract; the parties are presumed to have the laws of that place in view in making their contract. (1 Suth. Dam. 631.)

The judgment of the district court is affirmed.