TOD et al. v. KENTUCKY UNION LAND CO. et al.

(Circuit Court, D. Kentucky. July 11, 1893.)

No. 6,116.

1. CORPORATIONS—POWERS—GUARANTYING ACCOMMODATION PAPER.
  A corporation, in the absence of an express grant, has no power to guaranty, for accommodation, the obligations of another corporation.

2. SAME—POWER TO EXECUTE NEGOTIABLE PAPER—GUARANTY OF PAPER.
  A corporation with power to execute negotiable paper may bind itself as indorser or guarantor of bonds received by it in due course of business, for the purpose of increasing the value of such bonds. Railroad Co. v. Howard, 7 Wall. 414, followed.

3. SAME—POWERS—RULE OF CONSTRUCTION — CONTRACTS BY WHICH CORPORATION HAS BENEFITED.
  The rule that the charter of a corporation is to be construed strictly against the grantee does not apply to a case where the corporation seeks to repudiate contracts whereof it has enjoyed the benefits, or where such contracts are attacked by creditors after the corporation becomes insolvent. Chicago, R. I. & P. Ry. Co. v. Union Pac. Ry. Co., 47 Fed. Rep. 22, followed.

4. SAME—ACCOMMODATION PAPER—BONA FIDE HOLDERS.
  A corporation empowered to issue bonds or execute promissory notes is liable upon its accommodation paper in the hands of persons without notice that such paper was not executed for value.

5. SAME—CONSOLIDATION OF CORPORATIONS—GUARANTY OF BONDS OF ANOTHER CORPORATION.
  A land company empowered to form a "temporary or permanent consolidation" with any railway company, in furtherance of its general powers, may purchase all the stock of a railway company, and thereby control the same, if such control is in furtherance of the general powers of the land company.

6. SAME—GUARANTY OF SECURITIES OF ANOTHER CORPORATION.
  A land company thus empowered was authorized to open and develop mining and timber lands, and to condemn a right of way for the export of its products. Held, that the land company had power to guaranty the bonds and the interest on the preferred stock of the railway company, in order to complete the railway, and thereby secure a market for the products of the land company.

7. SAME—AMENDMENT OF CHARTER—RETROACTIVE EFFECT.
  While this temporary consolidation existed, the railway company issued and delivered to the land company second mortgage bonds on account of its indebtedness to the land company. The clause in the charter of the land company permitting a consolidation with a railroad company was

subsequently repealed. Thereafter, the land company guarantied the bonds, and hypothecated or sold them to bona fide pledgees and purchasers. *Held,* that the repeal did not prohibit the land company from continuing its union with the railway company, or from binding itself by the guaranty.

**8.** GUARANTY OF DIVIDENDS—AMOUNT OF GUARANTOR'S LIABILITY.

A land company, in the lawful exercise of its powers, guarantied indefinitely a semiannual dividend of 2½ per cent. on the preferred stock of a railway company. Thereafter both companies became insolvent. *Held,* that the holders of such stock, in the absence of evidence showing the value of such security to be greater or less than par, were entitled to prove claims against the guarantor to the amount of the par of their stock.

**9.** INSOLVENCY—RIGHTS OF LIEN CREDITORS AND HOLDERS OF COLLATERAL.

In insolvency proceedings under Gen. St. Ky. c. 44, art. 2, creditors having liens or collateral securities (in all cases not expressly excepted by the statute) are entitled to dividends on their whole debts, and not merely on the balances after deducting the value of their securities.

**10.** FEDERAL COURTS—FOLLOWING STATE PRACTICE.

In the absence of special provisions in the insolvency laws of a state, a federal court is not bound to follow the state courts as to the right of a creditor holding collateral security to a dividend on the full amount of his debt.

In Equity. Bill by J. Kennedy Tod, Hugh Oliver Northcot, and William Stewart Tod, the Central Trust Company of New York, and the Columbia Finance & Trust Company against the Kentucky Union Land Company and others for the appointment of a receiver, declaring an assignment under the law of Kentucky, on account of the debtor having made preferences, and sale of respondents' property. Decree was rendered for complainants, and a reference ordered. The commissioner now submits to the court questions as to the validity and priority of certain claims.

Olin, Rives & Montgomery, Butler, Stillman & Hubbard, and Humphrey & Davie, for complainants.

St. John Boyle, for J. W. Gaulbert and others, holders second mortgage bonds.

William Lindsay, Dodd & Dodd, and Grubbs & Moraney, for general creditors.

Before LURTON, Circuit Judge, and BARR, District Judge.

LURTON, Circuit Judge. The Kentucky Union Land Company made a conveyance operating as a preference to certain of its creditors. This conveyance was assailed as a fraudulent preference in contemplation of insolvency, and prohibited by article 2, c. 44, of the General Statutes of Kentucky.

Under the proceedings instituted in this court a decree was entered December 1, 1891, adjudging the said conveyance to be a preference, within the meaning of the said act, and that the same operated as an assignment, as of the 6th of February, 1891, of all of the property and effects of the Kentucky Union Land Company for the equal benefit of all its creditors, according to the provisions of said act; and a receiver was appointed, as required by the

Kentucky act, and the cause referred to the master of this court to advertise and receive proof of debt against said company, and to report who were creditors of the said company on the 6th of February, 1891, and the amount of the debts due to them, respectively, whether such debts were matured, and whether absolute or contingent. He was also directed to report what, if any, securities are held by any of the creditors of the land company.

Among other creditors filing claims with the commissioner, or intervening by petition, were:

(1) The holders of the first mortgage bonds of the Kentucky Union Railway Company, the principal and interest of which had been guarantied by the Kentucky Union Land Company. These bonds amount to $2,625,000, and the owners and holders are represented by J. Kennedy Tod, who stands for and represents the class with respect to the questions arising as to the validity of the guaranty of the land company.

(2) The holders of $800,000 of second mortgage bonds of the Kentucky Union Railway Company, the principal and interest having been guarantied by the Kentucky Union Land Company. These bonds are represented by J. W. Gaulbert, in respect to the question made as to the liability of the Kentucky Union Land Company as guarantor.

(3) The claim of the Central Trust Company. The Kentucky Union Land Company guarantied a 5 per cent. dividend upon stock of the Kentucky Union Railway Company, to the extent of $500,000. The land company agreed that, if the railway company and the land company should both fail to pay said dividend, then the Central Trust Company should be authorized to sue for same, and distribute the recovery among the holders of the guarantied stock.

The commissioner, finding the validity of the guaranty as to both bonds and stocks challenged by the other creditors and by the land company, has submitted to the court the questions arising upon the defense interposed, and has also asked directions as to how a debt should be reported when the creditor has more than one security, or when the debt is due from more than one creditor.

The matters upon which the commissioner asks instruction are those stated by him in his report to the court, as follows:

"The questions which your commissioner has, after advising with and obtaining the consent of counsel in this case, determined to submit to the court in advance of making a complete report, are these:

"(1) Was the guaranty of the Kentucky Union Land Company of the principal and interest of the first mortgage bonds of the Kentucky Union Railway Company within the power of the Kentucky Union Land Company. And, if within its power, was such power executed in a legal and binding way, so as to make such guaranty an obligation of the Kentucky Union Land Company?

"(2) Exactly the same question as arising upon the guaranty of the second mortgage bonds of the Kentucky Union Railway Company by the Kentucky Union Land Company.

"(3) Was the transaction set out in the claim of the Central Trust Company herein, and which pertains to the guaranty by the Kentucky Union Land Company of dividends upon certain stock of the Kentucky Union Rail-

way Company, and an agreement executed by said Kentucky Union Land Company with others to the Central Trust Company, a contract which it was within the power of the Kentucky Union Land Company to make; and, if so, was such contract validly and legally executed by said Kentucky Union Land Company? And, if it could be lawfully executed, what is the proper basis for proof of such claim as to amount, or what means should be taken to ascertain the said amount?

"(4) Where a creditor of the Kentucky Union Land Company holds as security for his claim any part of the assets of the Kentucky Union Land Company, is such creditor to be required to surrender or exhaust such security before proving generally against the assets of the Kentucky Union Land Company? And, in the event he shall realize upon such security, upon what basis does his claim then stand? In other words, can he prove for the whole of said claim against the general assets, or for balance left unpaid, or is he forbidden to receive any further payment until all other creditors have been made equal with him?

"(5) In the event that any creditor of the Kentucky Union Land Company has personal or other security from a corporation or individual other than the Kentucky Union Land Company, upon what basis is the claim to be computed against the Kentucky Union Land Company? Is it to be credited by such amount as may be received from such other security, and only the balance proved against the Kentucky Union Land Company, or may the whole debt be proved against the Kentucky Union Land Company, or is such creditor to be forbidden to receive any part of the assets of the Kentucky Union Land Company until all other creditors of the Kentucky Union Land Company shall have received an equal pro rata amount?

"(6) Are corporations which were organized by the Kentucky Union Land Company, all of whose stock is owned by the Kentucky Union Land Company, and all of whose assets were supplied to them by the Kentucky Union Land Company, to be considered as corporations independent of the Kentucky Union Land Company, as respects the application of securities granted by them to a creditor who is also a creditor of the Kentucky Union Land Company, or as personally bound to creditors who are also creditors of the Kentucky Union Land Company, or is such liability or such security granted by such corporations to be treated as if granted by the Kentucky Union Land Company, and subject to the same rule?

"(7) What collateral security is to be allowed J. Kennedy Tod & Co. upon their claim?

"Respectfully submitted.          Thos. Speed, Special Comr."

1. Did the Kentucky Union Land Company have the power to bind itself by its contract guarantying the principal and interest of the first mortgage bonds issued by the Kentucky Union Railway Company?

The question, as presented on this record, is a question, pure and simple, as to how far the authority to execute these contracts is sustained by the corporate powers which the law has vested in this company. No question arises as to the rights of bona fide holders of these bonds, for value, and without notice of the facts that the bonds had not been indorsed upon their sale and transfer by the guarantying corporation. The general doctrine may be taken to be well settled in the courts of the United States that the powers of a corporation are such, and such only, as are conferred by the law under which it is incorporated. The charter is the measure of the power of every corporation, and by this test must every corporate act be tried. This rule, however, concedes the usual propositions applicable to every legislative act,—that what is fairly implied is as much granted as if expressly enumerated. The cases

supporting this general doctrine are very numerous, and only a few need be cited: Pearce v. Railroad Co., 21 How. 441; Thomas v. Railroad Co., 101 U. S. 82; Pennsylvania R. Co. v. St. Louis, A. & T. H. R. Co., 118 U. S. 290, 6 Sup. Ct. Rep. 1094; Central Transp. Co. v. Pullman's Palace-Car Co., 139 U. S. 59, 11 Sup. Ct. Rep. 478; Maddox v. Graham, 2 Metc. (Ky.) 56; Davis v. Railroad Co., 131 Mass. 258; Marble Co. v. Harvey, 92 Tenn. ——, 20 S. W. Rep. 427; Miller v. Insurance Co., 92 Tenn. ——, 21 S. W. Rep. 39.

Mr. Justice Gray, in Central Transp. Co. v. Pullman's Palace-Car Co., after reviewing the decisions of the supreme court of the United States, concludes that they may be summed up thus:

"The charter of a corporation, read in the light of any general laws which are applicable, is the measure of its power, and the enumeration of those powers implies the exclusion of all others not fairly incidental. All contracts made by a corporation beyond the scope of those powers are unlawful and void, and no action can be maintained upon them in the courts, and this upon three distinct grounds: The obligation of every one contracting with a corporation to take notice of the legal limits of its powers; the interest of the stockholders not to be subjected to risks which they have never undertaken; and, above all, the interest of the public that the corporation shall not transcend the powers conferred upon it by law."

The power to execute accommodation paper, or to guaranty for accommodation the obligations of another corporation, is not expressly conferred by the charter of the land company. Ordinarily, such power is not implied from the powers conferred upon corporations, and such contracts are generally in excess of the powers of corporations, and therefore void as ultra vires, in the true sense of the term.

This proposition rests upon two or more very evident reasons:

(1) The corporate funds belong to its shareholders, and, by the very terms of the law creating it, cannot be devoted to any other purpose than those indicated by its charter and constitution. Such obligations would violate the fundamental terms of the agreement between the corporators themselves.

(2) To do so would be to exercise a power not conferred by the state, either expressly or impliedly. The state's grant of the corporate franchises is for the purpose prescribed, and the execution of such obligations would be beyond the power conferred, and therefore a diversion of the corporate purposes, as well as of the corporate funds.

(3) Such obligations rest upon no consideration, and would not, therefore, be valid. They would amount to a donation of the corporate funds, and therefore an unlawful diversion. Mor. Priv. Corp. 423; Davis v. Railroad Co., 131 Mass. 258; Madison Plank-Road Co. v. Watertown Plank-Road Co., 7 Wis. 59; McClellan v. File Works, 56 Mich. 579, 23 N. W. Rep. 321; National Park Bank v. German-American Mutual Warehouse & Security Co., 116 N. Y. 292, 22 N. E. Rep. 567; Aetna Nat. Bank v. Charter Oak Life Ins. Co., 50 Conn. 167.

But there is no inherent want of power in a business corporation, having the power to execute negotiable paper, to obligate itself

as a surety or guarantor. If such a corporation receive commercial paper or bonds in due course of business, we see no reason why, upon transferring such paper, it may not be lawful to obligate itself as indorser or guarantor. Such a contract would be a new and independent contract, and would rest upon a sufficient consideration, if entered into as a legitimate means of increasing the value of the security to be disposed of in ordinary course of business. In Railroad v. Howard the question arose as to the liability of a railroad company upon its guaranty of certain bonds issued by various counties and cities, and received by the railroad company in payment of subscriptions to its stock. Upon full consideration it was held that, inasmuch as the company had received the bonds in payment of stock, it had a right to obligate itself by its own bonds for the purpose of building its road; it might lawfully, and in furtherance of its authorized purpose, guaranty such bonds, as a means of augmenting their value on the market, thus producing funds to build its road. 7 Wall. 411, 412. The power of a corporation to bind itself by a guaranty, when it does so for its own benefit, and as a means of selling at an augmented value, is generally conceded by the authorities. "In such cases," says Mr. Randolph in his work upon Commercial Paper, (volume 1, § 334,) "the guaranty is an original contract of the corporation, for its own benefit; the consideration moving to itself, and not to the person whose debt is guarantied."

Where a corporation has power to issue bonds or execute promissory notes, it will be liable upon accommodation paper, though ultra vires, if such paper comes to the hands of a bona fide holder for value, without notice. Such a holder will be entitled to stand upon the presumption that the paper was executed for value, and for a lawful purpose. Mor. Priv. Corp. § 597; Monument Nat. Bank v. Globe Works, 101 Mass. 57; Mechanics' Banking Ass'n v. New York & S. White Lead Co., 35 N. Y. 505. The principle has been thus stated:

"Where a corporation has power, under any circumstances, to issue negotiable securities, the bona fide holder has a right to presume that they were issued under circumstances which give the requisite authority, and that they are no more liable to be impeached for any infirmity, in the hands of such a holder, than any other commercial paper." City of Lexington v. Butler, 14 Wall. 296.

There being no absolute want of power in an ordinary business corporation to bind itself as a guarantor, we must next inquire as to the circumstances which will make such a contract lawful and obligatory. The cases already cited establish the proposition that if such a corporation has the power to issue bonds or other commercial securities, and becomes the holder of such bonds or securities issued by other corporations, it may indorse or guaranty them upon transferring them for the purpose of raising money to carry out any purpose for which it might borrow money.

The right of a corporation to do an act or make a contract is not always a question of law. What it may not do under some

circumstances, it may do under others. It may carry on the business it is authorized to do in the usual and customary manner that business of the same nature is carried on by individuals. "It is, therefore," says Mr. Morawetz, "impossible to decide abstractly that acts of a particular description are within or without the chartered powers of a corporation. The right of a corporation to perform an act depends, in every case, upon all the surrounding circumstances, and facts can be conceived which would render almost any act justifiable." Section 362. He further observes (and it is an eminently sensible observation) that "no rules can be framed which would be of any practicable value in determining cases of this character. * * * The application of the law to individual cases must always remain a matter involving the exercise of sound, practical judgment, and business experience." "Great caution," he says, "is therefore necessary in treating a decision that a corporation has or has not authority to do a particular act as a precedent to be followed in other cases." Sections 362, 392.

Another general principle seems properly to require a statement before we apply the law to the circumstances surrounding the transaction now to be considered: The general rule in regard to the construction of a charter is that it is to be construed strictly against the grantee; that all which is not clearly granted, either expressly or by reasonable implication, is to be held against the corporation. But, where a corporation is seeking to repudiate liability upon a contract fairly entered into, a slightly modified rule of construction was stated by Mr. Justice Brewer, which seems to be in accord with the rule of the English courts, and to have the support of natural justice. The distinguished justice said:

"The question as to whether a contract is ultra vires or not may arise in a controversy between the state and a corporation, or between the corporation and the party with whom it has assumed to contract, and it may well be that different rules of construction apply to the two cases. All grants, even grants of corporate franchises, are construed strongly in favor of the government, and against the grantee. So, when the state challenges the action of one of its corporate creations, it may insist on clear warrant for such action. It may say: 'Point to the letter of your authority. I abide by my contract, and protect you in the rights and franchises I have given. Abide by your contract, and assume to do no act in disregard of the duties I have imposed, or beyond the authority I have conferred.' The rule of strict construction exists in such a case. But a milder rule applies when a corporation seeks to repudiate a contract into which it has formally entered. It is not seemly for a corporation, any more than for an individual, to make a contract, and then break it; to abide by it so long as it is advantageous, and repudiate it when it becomes onerous. The courts may well say to such corporations: 'As you have called it a contract, we will do the same. As you have enjoyed the benefits when it was beneficial, you must bear the burden when it becomes onerous, unless it clearly appears that that which you have assumed to do is beyond your powers.'" Chicago, R. I. & P. Ry. Co. *v.* Union Pac. Ry. Co., 47 Fed. Rep. 22.

In the light of these principles, let us look at the facts connected with the contract under consideration.

The Kentucky Union Land Company was incorporated under a special charter granted by the legislature of Kentucky in 1880.

Its original corporate title was, "The Central Kentucky Lumber, Mining, Manufacturing, and Transportation Company." This name was by amendment of charter in 1890, and after these bonds had been guarantied, changed to "The Kentucky Union Land Company." The original title indicated very thoroughly the large power conferred by the charter, and the composite character of the business contemplated thereunder. Under the second paragraph of the charter the corporation was declared—

"Capable in law of purchasing, selling, holding, leasing, conveying, receiving, by gift or devise, and disposing of all real and personal property and estate: making all contracts and by-laws, and doing all lawful acts necessary and proper for the business and powers hereby conferred upon them, properly incident thereto; and of suing and being sued, and have a common seal, which they may alter, abolish, or renew at pleasure; and the said company as such, shall have perpetual succession and have, enjoy, and exercise all the rights, powers, and privileges which corporations may lawfully have; and the rights, privileges and franchises given said company under the charter, or any amendments thereto, shall be for the use and benefit of said company, and its successors by gift or purchase, forever; and said company may change its name, and any other person or persons, or corporation who may become the successors of said company, by purchase and conveyance from the same, or by consolidation therewith, shall be entitled to all the benefits, and bound by all the disabilities contained in this charter and its amendments."

By section 3, authority was conferred upon—

"The president and directors of said company, when authorized, so to do, by a vote of the shareholders holding a majority of the bona fide capital stock of said company, may borrow money on the credit of said company not exceeding in amount the capital stock of said company,' and may issue the bonds of said company in such amounts, and payable when and where they may deem best, bearing such a rate of interest, payable annually or semi-annually, as they may determine on; and to secure said bonds and indebtedness they may mortgage the property of the said company; and upon foreclosure and sale of the same, the purchaser shall be entitled to all the rights, privileges, and franchises given in this charter, and any further amendments thereto; and said property may be purchased at said sale by any person, firm or corporation who shall by said purchase succeed to all the rights of said company as above provided."

The seventh section declares the powers of the company, and upon the proper construction of this section the validity of the guaranty in question depends. The whole section is here set out, and is as follows:

"The said company shall have the power to engage in the business of mining and manufacturing in any part of this commonwealth, and it may purchase and lease mineral and timbered lands, and contract for and purchase ore, timber, and machinery for manufacturing the same; and may open and develop mines of ore, coal, or other minerals; and may acquire by purchase or condemnation, the necessary right of way for exporting the products of the said mines and the same timber, either in their crude or manufactured state; and may establish and operate —— works, rolling-mills, saw-mills, and stove factories, and furniture factories, as may be expedient or necessary in the reduction and manufacturing of ores, and the manufacture of timber or implements for mining or cutting and preparing timber; and the said company may cut and prepare timber for market, and ship the same, either in logs, plank or manufactured articles; and shall have all rights, privileges, powers, and franchises necessary to the full use and enjoyment of the powers, herein granted; and may, in furtherance of the powers granted in this section, effect a temporary or permanent consolidation with any railroad or transportation

company, chartered or to be chartered, under the laws of this common-wealth; and the consolidated companies may have and exercise the powers of both companies, and act in the name of either of them, or in a joint name to be agreed upon in the articles or deeds of consolidation; but no such consolidation shall be effectual until the same shall have been ratified by a majority in value of the shareholders of the said company, at a regular or called meeting of said company."

The Kentucky Union Railway Company was organized under a special charter granted by Kentucky in 1854. Under its charter the stock might be subscribed for by "any individual or corporation." This company was authorized to build and operate a railway from a point on the Ohio river opposite Cincinnati to a point on the Virginia or Tennessee line at or near Cumberland Gap. By an amendment of charter it was given the discretion to make its northern terminus at Lexington, Ky. Prior to 1883 it built a road 14 miles long, connecting Clay City, in Powell county, with the line of the Newport News & Mississippi Valley Road.

Without undertaking to state the details as to how and under what circumstances, and upon what consideration, it is sufficient for the purpose of this case to say that, at the date of the contract of guaranty in question, shares of stock in the railway company to the amount of $1,800,000 were held and owned by the land company. This constituted the whole of the shares issued by that company, except, perhaps, nine, which were held by the directors of the railway company in order that they might be qualified to act. The land company at the same time had acquired the title to between 300,000 and 500,000 acres of mountain lands on the line of the projected continuation of this railway. In order to the development of these lands, and to the utilization of the timber and mines thereon, it became most essential that this railway should be completed. Did the land company have the power to aid in the extension and completion of this railway?

The powers expressly mentioned in its charter were: (1) To purchase and lease mineral and timbered land. (2) To purchase ore, timber, and machinery for manufacturing. (3) To open and develop mines of iron, coal, or other minerals. (4) To acquire by purchase or condemnation the necessary rights of way for exporting the products of the mines and the timber, either in crude or manufactured state. (5) To establish such works, rolling mills, sawmills, stove factories, and furniture factories "as may be expedient or necessary in the reduction and manufacturing of ores and the manufacturing of timber or implements for mining, or cutting and preparing timber." (6) It is given power to cut and prepare timber for market, and ship either in logs or manufactured articles. (7) It is finally declared that "it shall have all rights, privileges, powers, and franchises, necessary to the full use and enjoyment of the powers herein granted."

To make more plain the intent of the legislature that this company should have all the powers necessary to the full and beneficial use of the express powers and privileges granted, and in recognition of the fact that railroad facilities will be essential

to the utilization of the very wide and composite powers expressly conferred, the seventh section is concluded by adding these most significant words:

"And may in furtherance of the powers granted in this section, effect a temporary or permanent consolidation with any railroad or transportation company, chartered or to be chartered, under the laws of this commonwealth; and the consolidated companies may have and exercise the powers of both companies, and act in the name of either of them, or in a joint name to be agreed upon in the articles or deeds of consolidation. * * *"

Now, the case, as it was presented to the land company, was this: "We have purchased, as authorized by our charter, a vast body of timbered and mineral lands. We are authorized, expressly, to utilize these lands by developing their timber and mineral interest. The intention of the legislature was that this buried natural wealth shall be utilized by the erection of sawmills, iron works, rolling mills, furniture factories, iron furnaces, and by the opening and operating of iron and coal mines. It contemplated that transportation of the products of these mines, mills, and factories would be a matter of great concern. The right to condemn rights of way is conferred."

That railroad transportation would be essential to get to market these products, and for the necessary development of the towns which must spring up around enterprises so numerous, was also in contemplation of the state when the charter was granted, is evident from several considerations:

(1) The coal, iron, and timber, and the manufactured products of the contemplated mills and factories could not be profitably utilized without cheap transportation.

(2) That the company should engage in transportation is indicated by the original title of the corporation. It was to be a transportation company as well as a mining and manufacturing company.

(3) The power to consolidate with any railroad company, chartered or to be chartered, is expressly conferred.

(4) In case of such consolidation the companies were to exercise the powers of both, and act in the name of either, or in an agreed name. The power did not stop here. There might be a "temporary consolidation" with a railroad company. The meaning to be attached to the term "consolidation," as used in a law authorizing the consolidation of two or more corporations, is uncertain. It depends not often upon the particular terms of the act giving the power, and the legal effect resulting from "consolidation" will largely depend upon the character of the consolidation authorized by the permission, as well as upon the contract actually entered into by the consolidating companies. Generally, the merging of the companies into a new and distinct corporation is contemplated, and is the legal result. Not infrequently, the absorption of one corporation by the other is the consequence of consolidation. Railroad Co. v. Georgia, 98 U. S. 362, 363; Railway Co. v. Ham, 114 U. S. 595, 5 Sup. Ct. Rep. 1081; Mor. Priv. Corp.

§§ 942, 939.  Mr. Morawetz states a third kind of consolidation as possible, "by preserving the legal identity of both companies. This may be done by issuing shares in the one company to the shareholders in the other company in exchange for their shares, thus making the one company the holder of all the shares in the other company, or by regarding the united shareholders of both companies as shareholders in each corporation; both corporations, however, acting under similar charters, and under the same management.  These transactions would differ widely in their legal consequences.  Whether the result be called a 'consolidation' or 'merger,' or 'amalgamation' is merely a matter of definition."  Section 942. The power to consolidate a land, mining, and manufacturing company with a railroad company, and to make such consolidation either permanent or temporary, must enlarge the general scope of the powers of such a corporation.  It contemplates the absorption of the railroad company by the land company, and the absolute assumption by the latter of the debts of the former.  It also contemplates the acquisition of all the franchises of the railway company.  The greater power, of entirely absorbing and extinguishing the railway as an independent entity, clearly includes the lesser power, of a union by which the railway company might retain its identity, and yet be in such connection with the land company as to amount to what the legislature defines as a "temporary consolidation."  The case of Branch v. Jesup, 106 U. S. 468, 1 Sup. Ct. Rep. 495, is an instance of construction of charter powers much in point.  There a power conferred on one railway company to incorporate its stock with the stock of any other company was held to so enlarge the powers of the company as to enable it to sell and dispose of a part of its line of said railway to another company.  To consolidate so as to create a new company out of the old consolidating companies would inevitably operate to dissolve the old companies.  To consolidate so as to bring about the absorption of one by the other would as inevitably dissolve the absorbed company.  Clearly, neither of these consolidations could be "temporary."  A dissolved corporation is an extinct corporation, and when, by the death of both, a new corporation is created, there cannot be, without new legislative birth, a resurrection of the dissolved and extinct factors.  Yet the Kentucky Union Land Company was expressly empowered to consolidate with a railroad company in such a way as that the union should be "temporary." If a reasonable and useful meaning can be given to this alternative power, it ought to be done, rather than that the power to make a "temporary consolidation" be considered as an idle and useless term. The legislature has not used technical language in conferring this power, and we ought not to attach a technical meaning to the words unless such meaning is otherwise required in order to give effect to the legislative intent.  There is nothing in this charter to indicate that only a technical consolidation was authorized.  On the contrary, the power to make a "temporary consolidation," looking to all the four corners of this charter, clearly implies the

power to make such an alliance or bring about such a union and co-operation of interests between the land company and a railway company as shall be to the mutual interest of each, and place both under the same control and management. This could be done by the plan suggested by Mr. Morawetz in section 942, whereby the shares of one company should be held by the other, or by the same persons. This meaning seems reasonable and proper, looking to the objects and purposes of this corporation, and any steps which brought about unity of interest and co-operation in purpose as being legitimate and authorized. Under this power, we are of opinion that the Kentucky Union Land Company had the power to acquire the shares in the railway company, and the right to exercise control over the railway company through the ownership and control of those shares.

Undoubtedly, the general rule is that a corporation has no implied power to acquire shares in another for the purpose of controlling it. Marble Co. v. Harvey, 92 Tenn. ——, 20 S. W. Rep. 427. This would be contrary to the well-understood public policy concerning such companies. But this objection does not lie here:

(1) Because the charter of the railway company expressly provides that its shares may be owned by any other corporation.

(2) The express power in the charter of the land company removes all objections, based on grounds of public policy, to its control of a railway company by and through its shares.

What the legislature of Kentucky has expressly permitted cannot be void, as against public policy, in the absence of any violation of a constitutional provision. Under such circumstances it is not for the courts to say that what the legislature authorizes is unlawful, because contrary to public policy. Having authority to acquire this stock, the land company became the sole stockholder in the railway company. Each had express authority to borrow money and issue bonds to carry out the purposes of the organization. The completion of this railway was an object within the scope of its charter powers. It could do so by its own name, or by aiding the railway company to negotiate its securities, by guarantying their payment. The guaranty was not for the accommodation of the railway company. The guarantor being the sole shareholder of the railway company, it was a contract for its own benefit, and therefore rested upon a sufficient security. In addition, the land company was a creditor of the railway company, and was to, and did, receive the proceeds arising from sale of one-half million of these bonds. The remainder of the money thus raised was to be applied to the building of the railway line. The consideration was sufficient to fully support the contract.

A like question arose in Chicago, R. I. & P. Ry. Co. v. Union Pac. Ry. Co., 47 Fed. Rep. 16, where Mr. Justice Brewer held that:

"Where one railroad company owns substantially all the stock of another railroad company, a lease of the latter line for rent to be paid to the former company is not void for want of consideration, since it amounts merely to an agreement to pay the rent directly to the stockholders."

Upon appeal to the United States circuit court of appeals for the sixth circuit, this ruling was affirmed. 51 Fed. Rep. 329, 2 C. C. A. 242.

The directors of the railway company held the property of that company, including these bonds and their proceeds, when sold, in trust for the Kentucky Union Land Company, as holders of the shares in that company. To say that its guaranty of these bonds was a mere accommodation guaranty, when it was the cestui que trust in the proceeds of the bonds, and thereby enable it to defeat its responsibility, as a contract ultra vires, would be sticking in the bark, and result in manifest injustice. That at some future day this union may be dissolved by a sale of the stock owned by the land company is not of importance. The real and substantial owner of the railroad company at the time these bonds were guarantied was the land company. The guaranty was for the benefit of the guarantor. Union Pac. Ry. Co. v. Chicago, R. I. & P. Ry. Co., 51 Fed. Rep. 310, 2 C. C. A. 174.

The case is not like that of Davis v. Railroad Co., 131 Mass. 258. That was a donation to support a musical festival. The benefit to the railroad company was in the supposition that it would profit by increased travel. This was altogether too remote, and the contract properly held void.

When the question is, as here, whether or not a particular act is ultra vires, decided cases are of little value. Each case must be largely a question of fact. Yet, by reference to a few of the decided cases, we can discover the principle upon which other courts have proceeded in deciding such questions. We will refer to a few cases: In Louisville & N. R. Co. v. Literary Society of St. Rose, 15 S. W. Rep. 1065, the court of appeals of Kentucky passed upon a question involving the implied powers of a corporation. It appeared that the Literary Society of St. Rose and the Literary Society of St. Catherine were corporations for educational purposes, existing in or near the town of Springfield, in Washington county, Ky. They had power to contract, and to buy and sell real and personal property, for the purpose of sustaining and carrying on said institutions of learning, and not otherwise. Each of them owned and operated a farm of about 1,000 acres, of very considerable value. This, in the language of the court, "created a large industry in the way of supplies furnished to them, and they, in turn, furnishing to others." Each of these corporations signed an obligation to pay a certain amount of money, by way of a donation, to a railroad company, to induce it to extend its line near their property. In an action upon these obligations it was contended that they were ultra vires. The court said:

"Corporations derive their powers from their charters. They are those which are expressly given, or, by fair implication, are necessary to the execution of their object. Cases may be found where the officers of a corporation have exceeded their powers, but the corporation, nevertheless, held liable, because the transaction was within the scope of its business, and it had received a benefit from it. The only trouble arose from a defect of power in the managers. This case is not within this class, however, because it ap-

pears, beyond all doubt, that the change of location, as to depot, was not to the interest of these institutions. The building of the road was calculated, however, to be highly beneficial to them, both as furnishing convenient access to them for persons coming and going, and also in furnishing them a means of obtaining their supplies, and sending their products to market. It was calculated to, and undoubtedly did, add greatly to the value of their properties, and the large industries which their charters had authorized them to create. It conferred a direct benefit. The power existed, by fair implication, to do anything reasonably calculated to add to this value. How far this power extended, we need not decide. Certainly, however, if, during a portion of the year, these institutions had been almost inaccessible, for the lack of a turnpike or a bridge, a subscription by them to build either would have been valid; and, while not authorized to enter into all manner of speculations, yet, in our opinion, a subscription by them to aid the building of this road was not, under all the circumstances, ultra vires, and therefore void."

Where a corporation owned a large body of wild lands, and had power by their charter "to aid in the development of minerals and other materials, and to promote the clearing and settlement of the country," it was held that the building of sawmills and an hotel for the accommodation of those having business in connection with carrying out the prime object of the corporation was within its powers. Watts' Appeal, 78 Pa. St. 370.

In Manufacturing Co. v. Clark, 32 Mo. 305, it was held that a company authorized to mine coal had authority to purchase and run a steamboat for the transportation of the coal to market.

One railway company, under authority of law, leased the line of another for a term of years. The consideration of the lease was an annual rental, and that the lessee company should guaranty the principal and interest of bonds to be issued by the lessor company. The contract of guaranty was challenged as ultra vires. The lessee company had no express authority to make such contract of guaranty, but did have power to make all such contracts as were usual and proper in the building and operation of a railway, and it likewise had power to lease the line of the lessor company. It was held that the consideration was sufficient, and the guaranty valid. The court was of opinion that it was as competent for the company to promise to pay conditionally as to promise to pay absolutely; that the validity of the agreement depended upon the sufficiency of the consideration. The right to take the lease being express, it was a good consideration for the conditional promise involved by a contract of guaranty. Low v. Railroad Co., 52 Cal. 53. See, also, Smead v. Railroad Co., 11 Ind. 104, and Zabriskie v. Railroad Co., 23 How. 381, where a general authority to aid a connecting railroad company was held sufficient to authorize the guarantying of the bonds of such road. Also, Mor. Priv. Corp. § 423.

Under the laws of Wisconsin, railroad companies were given power to make such contracts with railroads terminating on the eastern shore of Lake Michigan, within the state of Michigan, as would enable them to run their roads in connection with each other, etc., and to "build, construct, and run, as a part of their corporate property, such number of steam boats or vessels as they may deem

necessary to facilitate their business." Held, that under this power a railroad company could contract with a steamboat company to run in connection with its line, and might lawfully guaranty that their savings should not fall below a certain sum. Green Bay & M. R. Co. v. Union Steam-Boat Co., 107 U. S. 98, 2 Sup. Ct. Rep. 221. In that case, Mr. Justice Gray said:

"Whatever, under the charter or other general laws, reasonably construed, may fairly be regarded as incidental to the objects for which the corporation is created, is not to be taken as prohibited."

A contract by a mining corporation to advance a specific sum of money to aid in the construction of a tunnel to drain its mine was held not to be ultra vires, and that such a contract came within the incidental and implied powers of a mining company. Sutro Tunnel Co. v. Segregated Belcher Min. Co., 19 Nev. 121, 7 Pac. Rep. 271. "Where a corporation was formed for the purpose of dealing in and speculating in real estate, and with the express power 'to buy, improve, sell, lease, and otherwise dispose of real estate,'" it was held that the term "improve" includes the performance of any act, whether on or off the land, the direct and proximate tendency of which was to benefit or enhance its value. It was therefore held that a subscription made by such a corporation to a railroad company for the purpose of increasing the facilities and lessening the cost of transportation on the same, "where the direct and proximate tendency of such increase of facilities is to enhance the value of its lands," was a valid and binding contract. Vandall v. Dock Co., 40 Cal. 84.

In the case of Whetstone v. University, 13 Kan. 320, (the opinion being delivered by Mr. Justice Brewer,) it was held that where a corporation was created for the purpose of locating and laying out a town site, and making improvements thereon, it was within the power of such a company to donate lands for the purpose of securing the erection and maintenance of a school upon property adjacent to that owned by the town-site company; "that the direct and proximate tendency of the improvements sought to be obtained by the donation is the building up of the town, and the enhanced value of the remaining property. The purpose of the corporation is to build up the town. * * * and this purpose is directly furthered by such a donation."

Upon evidence that it was customary and necessary, in the economical conduct of the business of iron furnaces, to conduct a supply store in connection therewith, it was held by the supreme court of Tennessee that debts created in the purchase of a stock of goods for such store were valid obligations of the furnace company. The power to conduct such a store, being clearly incidental to the business of making iron, was therefore within the corporate powers of the company, though not mentioned in the charter. Searight v. Payne, 6 Lea, 283.

A most important and instructive case, involving the circumstances under which a corporation may, under its implied powers, enter into a valid obligation as guarantor of the bonds of another

company, is that of Ellerman v. Stock-Yards Co., (N. J. Ch.) 23 Atl. Rep. 292.

2. The guaranty of a dividend upon the preference stock of the railway company stands upon the same footing as the guaranty upon the bonds. The "temporary consolidation" between the two companies, springing out of the ownership of the stock in the railway company by the land company, in view of the terms of the charter of the latter company, authorized it to aid the former in any usual way to build its line of railroad.

3. As to the guaranty of the second mortgage bonds issued by the railway company: Bonds to the amount of $800,000, secured by a second mortgage on the property of the Kentucky Union Railway Company, were issued and delivered to the Kentucky Union Land Company on account of indebtedness due by the railway company to the land company. A large part of these bonds were sold by the land company, and are now in the hands of various individuals, who hold same as bona fide purchasers for value. When sold, the payment of these bonds, principal and interest, was guarantied by the land company. Others have been pledged as collateral security, and these, also, were guarantied by the land company. The bonds, having been received in payment of, or on account of, indebtedness, became the property of the Union Land Company. To augment their value when sold, or pledged as collateral, their payment was guarantied. It is true that when this guaranty was placed on the bonds the clause in the charter of the land company permitting a consolidation with a railroad company had been repealed. Inasmuch, however, as the connection between these two companies was authorized when the latter acquired the stock of the former, and paid or assumed its debts, and inasmuch as this alliance, union, or "temporary consolidation" was in force when this repealing act took effect, and when these bonds were guarantied, we think it was not prohibited by the repeal from continuing the union of the two companies, or obligating itself by this guaranty. The amendment should be construed as prospective, and not retrospective. Any relation which had theretofore been entered into with this railway company was not affected by the amendment, and all which could be lawfully done by reason of such existing lawful union might thereafter be done, so long as it continued. Irrespective of the particular power resulting from the "temporary consolidation," and the relations resulting therefrom, this obligation of the land company is valid, under the authority of the case holding that a corporation having the power to bind itself by commercial paper might indorse or guaranty commercial obligations received in ordinary course of business, and guarantied when sold to augment the price realized on their sale and transfer. Railroad Co. v. Howard, 7 Wall. 392, and cases heretofore cited.

4. The commissioner submits to the court the question as to the proper basis upon which the claims of the Central Trust Company shall be reported. In event of default of payment of dividends guarantied on stock of Kentucky Union Railway Company, the

Central Trust Company was authorized to sue and collect such dividend for the use of the holders of the guarantied shares. The dividends were not guarantied for any particular term. The guaranty is indefinite, and is an obligation so long as the stock is outstanding. The railway company and the land company are both insolvent, and the assets of each company are now to be distributed among creditors. The holder of stock so guarantied is a creditor of the guarantying company, and as such entitled to prove his claim, and share in the assets along with other creditors. The proper basis seems to be the value of his claim. That value in this case would be the value of stock upon which a semiannual dividend of $2\frac{1}{2}$ per cent. was guarantied by a solvent guarantor. If the dividends were guarantied for only a limited number of years, then the value of the guaranty would be the present value of dividends payable at future dates, and this would require a calculation based upon the payment by anticipation of a recurring future liability. But here we are to deal with an indefinite and practically perpetual obligation. The obligation is not only breached with respect to past-due dividends, but the creditor is, in view of the winding up of this corporation, entitled to recover now the entire value of this future and perpetual obligation. An obligation to pay perpetually a dividend of $2\frac{1}{2}$ per cent. semiannually must be valued, and a recovery had commensurate with the consequences to such a creditor of the total failure of this company to in any way hereafter fulfill its guaranty as to future as well as past dividends. The creditor's loss is the present value of an obligation bearing interest at the rate of $2\frac{1}{2}$ per cent. semiannually. This must be ascertained upon the assumption that the guarantor is solvent. The insolvency that now in fact exists cannot be looked to in ascertaining the loss sustained by the holder of such a security. Such a security is not, as the court may judicially know, in the absence of evidence, worth less than the par of the stock. The Central Trust Company will therefore be entitled, in the absence of evidence showing a less or greater value than par of such a security, to prove its claim as trustee upon the basis of the par value of the stock so guarantied.

Instruction is asked as to the basis upon which a debt is to be reported:

(1) Where the creditor is otherwise secured, either by collaterals or by prior mortgage on property of the land company.

(2) Where the creditor has personal or other security from a corporation or individual other than the land company.

A payment made by the Kentucky Union Land Company to Kerr was held to operate as a fraudulent preference in view of insolvency, under the Kentucky statute, being article 2, c. 44, Gen. St. Ky. The decree pronounced in this cause December 1, 1891, adjudged that preference to be within the meaning of that statute, and the payment aforesaid "operated as an assignment and transfer of all of the property and effects of the said Kentucky Union Land Company owned by it upon the 6th day of February, 1891, and," so proceeds the decree, "it is hereby declared to have inured to the benefit of all the creditors of the said Kentucky Union Land

Company in proportion to the amount of their respective demands, including those which are future and contingent, subject, however, to the preferences declared, if any there be, in the distribution of the assets as provided by chapter 44, art. 2, § 7, of the General Statutes of Kentucky." Since that decree the supreme court of Kentucky have held that under an assignment by operation of law a creditor having a lien or other security cannot participate in the residue of the assets until the general creditors have received an amount equal, pro rata, with the lien creditors. Bank v. Laughbridge, (Ky.) 18 S. W. Rep. 1. The effect of this mode of distribution would be to compel all creditors to surrender any security before being permitted to share equally with unsecured creditors in the effects of an insolvent estate, or to postpone all such creditors in the distribution until unsecured creditors have received a dividend equal to the value of the security held by the lien creditors. This is contrary to the rule in equity relating to creditors having two or more securities. The general rule of equity, as administered in the courts of Kentucky, in case of an assignment made by the creditor himself, is that a creditor holding collateral, or secured by a prior mortgage or lien, is entitled to share in the general distribution for his whole debt, where the assets are not sufficient to pay all the creditors, and his security under such general assignment is not to be diminished by reason of any other security he may have. If the lien or collateral fails to pay the debt, the amount realized from it is not to be credited on the debt, and a pro rata given him on the balance, but his dividend is to be paid him on the basis of the entire debt. In Logan v. Anderson, 18 B. Mon. 92, the rule stated was established. In that case it was said:

"If a creditor has a mortgage on property of the debtor sufficient to pay 50 cents on the dollar, and then a subsequent mortgage is made to the same creditor, including other creditors, on other property sufficient to pay 50 cents on the dollar, the first mortgage creditor has the right to have his whole debt paid, while the several mortgage creditors get but 50 cents on the dollar, and for the reason that each mortgage is given to secure the whole debt of the first mortgagee; and the fact that the property last mortgaged fails to pay the last mortgagees is no reason for lessening the security of the first mortgagee, as he had the legal and equitable right to obtain both mortgages to secure his debt. So, if a creditor holds a mortgage on part of the debtor's estate, and the debtor then assigns his whole estate for the payment of all his debts, the debt of the mortgage creditor is embraced by the assignment,—not a part of it, but the whole,—and in the same manner and to the same extent as the debts of the creditors who have no liens. There are two funds, each of which is liable for the whole debt of the mortgage creditor; and, where both are necessary for the payment of the debt, equity refuses to interfere or marshal securities to the double fund."

This case, so clearly declaring the general rule of equity, has been repeatedly followed in Kentucky. Bank v. Jefferson, 10 Bush, 326; Bank v. Patterson, 78 Ky. 291; Spratt v. Bank, 84 Ky. 85. This rule is established as the equitable rule of distribution in cases of a double fund. Kallock's Case, L. R. 3 Ch. App. 769; Mason v. Bogg, 2 Mylne & C. 443; People v. E. Remington & Sons, 121 N. Y. 329, 24 N. E. Rep. 793; West v. Bank, 19 Vt. 403; Bank v. Kendrick, 92 Tenn. ——, 21 S. W. Rep. 1070; Miller's Appeal, 35 Pa. St.

481; Brough's Estate, 71 Pa. St. 460; Miller's Estate, 82 Pa. St. 113; Morton v. Caldwell, 3 Strob. Eq. 162; Allen v. Danielson, 15 R. I. 480, 8 Atl. Rep. 705; Brown v. Bank, 79 N. C. 244; In re Bates, 118 Ill. 524, 9 N. E. Rep. 257; Bank v. Haug, 82 Mich. 607, 47 N. W. Rep. 33; Kellogg v. Miller, 22 Or. 406, 30 Pac. Rep. 229; Findlay v. Hosmer, 2 Conn. 350; Moses v. Ranlet, 2 N. H. 488. The learned Kentucky court recognize a distinction in the legal and equitable consequences resulting from an assignment voluntarily made by a debtor, and an assignment by operation of law. In the first case it abides by the rule so clearly stated in Logan v. Anderson. But in the second it reaches the conclusion that, while the statute which effected the assignment did not prescribe any other than an equal distribution, yet that rule of distribution prescribed by statute in regard to an insolvent decedent's estate should apply where the assignment was by operation of law. We do not understand that that court finds in chapter 44, art. 2, Gen. St. Ky., any express provision in regard to the rights of creditors having liens or collaterals, but that analogy to the decedent's statute made it right to prescribe a similar method of distribution. We do not consider that this court is bound to follow this decision. (1) We cannot, upon a fair construction of it, read the decision as holding that the statute prescribed any mode of distribution other than an equal one between all creditors, with a few limited exceptions, especially enumerated. The court, in our judgment, simply regarded itself at liberty to disregard the general rule, as laid down in its own well-considered opinions, and adopt a rule which would distribute an insolvent's property, while living, as the statute prescribed it should be if he were dead. (2) This statute had not been construed in this particular when the decree of this court was pronounced, holding that the preference given by the Union Land Company had operated as a general assignment. The question was res integra, and it was for this court to determine for itself the rights of creditors under such an assignment. It seems to us that the question is one of general law. Upon questions of this character, the federal courts administering justice in Kentucky have equal and co-ordinate jurisdiction with the courts of the state, "although they will lean 'towards an agreement of views with the state court, if the question seems to them balanced with doubt.'" Clark v. Bever, 139 U. S. 117, 11 Sup. Ct. Rep. 468; Burgess v. Seligman, 107 U. S. 33, 2 Sup. Ct. Rep. 10; Railroad v. Lockwood, 17 Wall. 357; Dodge v. Tulleys, 144 U. S. 457, 12 Sup. Ct. Rep. 728.

Our conclusion is that each creditor is entitled to prove the whole of his debt, and to be paid a dividend thereon, without any abatement by reason of any other security, lien, or collateral, whether the same was given him by the Union Land Company or another. A decree will be drawn in accordance with these views, and the commissioner directed to report in accordance with this opinion.

BARR, District Judge, concurs.