## WM. FILENE'S SONS CO. v. GILCHRIST CO. *

### In re GILCHRIST CO.

(Circuit Court of Appeals, First Circuit. November 13, 1922.)

### No. 1575.

1. **Corporations** ⊗⟹484(3)—**Guaranty by a corporation of a lease of another unrelated corporation held ultra vires.**

   A corporation organized under Pub. St. Mass. c. 106, for the stated purpose of "buying, selling, jobbing, manufacturing and dealing in dry goods and general merchandise and carrying on the business of a department store," under section 50 of the act, providing that a corporation organized thereunder shall not "direct its operations, or appropriate its funds to any other purpose than that specified in its agreement of association or its charter, as the case may be," *held* without power to bind itself by a guaranty of a lease made by another corporation having no connection with its business.

2. **Corporations** ⊗⟹484(3)—**Common stock control of two corporations does not validate guaranty by one of lease made by the other.**

   That the same person owns the controlling stock interest in two unrelated corporations does not validate a guaranty by one of a lease made by the other, otherwise ultra vires, especially where he acquired the stock of the guarantor for the express purpose of obtaining such guaranty.

3. **Corporations** ⊗⟹484(3)—**Claimed incidental benefit held not consideration for guaranty by corporation.**

   The claim that a department store corporation would benefit by having a friendly competitor near by, to create a trade center, *held* not to validate a guaranty by the corporation of a lease of the premises by such competitor.

Appeal from the District Court of the United States for the District of Massachusetts; James M. Morton, Jr., Judge.

In the matter of the Gilchrist Company, bankrupt. From an order disallowing the claim of Wm. Filene's Sons Company, claimant appeals. Affirmed.

For opinion below, see 278 Fed. 235.

George R. Nutter, of Boston, Mass. (Jacob J. Kaplan and Dunbar, Nutter & McClennen, all of Boston, Mass., on the brief), for appellant.

Sherman L. Whipple, of Boston, Mass. (Alexander Lincoln, of Boston, Mass., on the brief), for appellee.

Before BINGHAM and JOHNSON, Circuit Judges, and HALE, District Judge.

HALE, District Judge. On May 29, 1912, the Gilchrist Company made a written guaranty to William Filene's Sons Company of a lease executed by the Filene Company to the Wm. S. Butler Company of premises at the southwest corner of Washington and Winter streets in the city of Boston. For some time before the execution of this guaranty, these three Massachusetts corporations had been engaged in the

conduct of dry goods stores; the Butler Company on Tremont street, the Gilchrist Company on the northwest corner of Washington and Winter streets, and the Filene Company on the southwest corner of Washington and Winter streets, directly opposite the Gilchrist Company. This store of the Filene Company was a collection of buildings, which had been built by annexing surrounding stores. At the time in question the Filene Company had arranged to move into a new site, located on the corner of Summer and Washington streets, diagonally opposite its old location. The Filene Company moved into this new store, and the Butler Company took possession under its lease early in September, 1912. On November 7, 1912, receivers were appointed by the United States District Court for the Butler Company and also for the Gilchrist Company. On December 9, 1912, the Filene Company entered by leave of court for breach of conditions of the lease and took possession of its former property. In March, 1913, an involuntary petition in bankruptcy was filed against the Gilchrist Company. On September 13, 1913, the Filene Company filed a petition for damages under the lease against the Butler Company, which was finally allowed by the Supreme Court of the United States (William Filene's Sons Co. v. Weed, 245 U. S. 597, 38 Sup. Ct. 211, 62 L. Ed. 497) for $205,805.71. A claim in bankruptcy against the Gilchrist Company was filed by the Filene Company; and after many hearings before the referee, it was allowed by him for $205,805.71. The Gilchrist Company petitioned to the District Court for a review; that court vacated the order of the referee and entered an order disallowing the claim. The case is now before us upon an appeal by the claimant, the Filene Company, from this order of the District Court.

[1] The Gilchrist Company was organized under the General Corporation Laws of Massachusetts (Public Statutes, c. 106), the certificate stating the purposes of the company to be:

"Buying, selling, jobbing, manufacturing and dealing in dry goods and general merchandise and carrying on the business of a department store."

Section 50 provides that a corporation subject to that chapter shall "not direct its operations or appropriate its funds to any other purpose than that specified in its agreement of association or its charter, as the case may be." It is assumed on all sides that the power to manufacture, buy and sell merchandise, and carry on the business of a department store does not include the power to guarantee a lease to another corporation on neighboring premises, unless it can be shown that such power is fairly incidental or auxiliary to the main business of the corporation, and necessary or expedient in the protection, care and management of its property. Teele v. Rockport Granite Co., 224 Mass. 20, 25, 112 N. E. 497.

The case presents this plain question of fact: Has the claimant proved by a preponderance of evidence that the execution of the guaranty by the Gilchrist Company was reasonably incidental and auxiliary to its business and within the scope of its powers?

The claimant has offered testimony tending to show that, at the time of the execution of the guaranty, the Gilchrist Company was vitally interested in the nature of the occupation to be made of the old

Filene store; that the site of that store was in the general location of the department stores of Jordan & Marsh, the Hovey Company, and the R. H. White Company; that it was of importance to have the old Filene site occupied by a department store, rather than by an office building or a manufacturing plant; that it was of special advantage to the Gilchrist Company that this site be held by a "kindly competitor," that is, by a competitor who would not compete in a hostile way, so as to break prices, and that thus it was of advantage that it be occupied by a company who held a majority of the stock of the Gilchrist Company and could therefore be counted upon to operate the competing store in a friendly way; that the financial welfare of the Gilchrist Company was vitally linked with that of the Butler Company by reason of a joint bond issue; and that co-operative advertising would be of advantage to both companies. Mr. Dunbar, claimant's learned counsel, testified that Mr. Butler, head of the Butler Company, had told him that he regarded it as very important for the Gilchrist Company to have the old Filene corner occupied by a concern in a similar line of business to that of the Filene store on the corner of Summer and Washington streets, and with these two stores on the corner of Winter and Washington streets that corner would be the great department store center and the most important place in Boston; that there would be a great many people there; and that, while some thought it might be a disadvantage for competing stores to be on opposite corners, it was his opinion that those three stores in the same line of business on three of the four corners would attract so many people to that locality that it would be beneficial to all.

The record does not show very clearly in what way the joint bond issue between the two companies would be dependent upon proximity of stores, nor does it show that co-operative advertising would be greatly assisted thereby. The record also fails to disclose any other bidders who were seeking to obtain the old Filene corner under the terms offered by the Gilchrist Company. It appears, too, that the Filene Company preferred to get a bonus of $20,000 under the lease to the Butler Company rather than to keep their old site and put into this store a "kindly competitor" who would not compete too much.

The appellee urges that the plan of guaranty was not devised by the Gilchrist Company for purpose of obtaining for itself special advantages; that such guaranty with the limited capital of that company could not bring to it any advantage; that it in fact brought bankruptcy; that it was a scheme of finance conceived by an adventurer, who was looking only to his own personal advantage, and who later committed suicide, after he had wrought the ruin of himself and two leading dry goods companies.

[2] Let us follow the current of facts leading up to the execution of the guaranty. Early in 1912, William E. Butler, head of the Butler Company, appears by the testimony to have had the general purpose of getting into the group of department stores on Washington street and to have formed the plan of obtaining a lease of the old store of the Filene Company, when that company should vacate it to go into its new store. It appears to have been a part of Butler's plan to operate

a store conducting a similar line of business with the Gilchrist Company and the Filene Company, and on a more ambitious scale than that which the old Butler store had conducted on Tremont street. His new venture was to carry on a medium high-priced specialty business in women's garments on Washington street. Charles C. Ferris, the president of the Gilchrist Company, had heard of Butler's plan, and in February or March, 1912, Ferris asked Butler if it was true that he was thinking of renting the old Filene store, and called his attention to the fact that the Gilchrist Company did not have the means to take on such an enterprise; that Butler had lost money in his own store, and that he could not thus add to his already overloaded expenses. Butler admitted that he was thinking of taking a lease; but he assured Ferris that the finances would be provided for, that he had a friend by the name of Lehigh who was assisting, and that the Gilchrist Company would suffer no harm. On April 17, 1912, Butler executed a preliminary agreement with the Filene Company by which that company agreed to sublet him the premises occupied by the old Filene store, Butler assuming all the obligations of the leases and paying in addition a bonus of $20,000 a year up to February 28, 1921. Butler agreed forthwith to accept a sublease and "on or before May 1, 1912, to cause such sublease * * * or the full performance of this agreement to be fully guaranteed in manner satisfactory to Filene's by a corporation to be organized by him which shall then have a net, fully paid in cash capital of not less than $250,000." It appears, then, that up to this time it was not in Butler's mind to have the Gilchrist Company participate in his adventure; it was his plan to organize a new company to take the lease and hold the premises. Butler was unable, however, to secure the capital from Lehigh or any one else, and so could not organize his new company.

On April 30th, Mr. Dunbar, counsel for the Filene Company, called on Mr. Butler to see what he was going to do about this agreement calling for a lease to a new $250,000 corporation. Butler then told him that he was not certain that he should want to form a new company; that he might want to use the lease in connection with an existing company; but that he "regarded it as very important for his plan that he should have the corner of Winter and Washington streets, this property which the Filene Company then occupied."

Mr. Dunbar further testified that Butler repeated that he was not then ready to say how he wanted to use the preliminary agreement; he wanted more time. The agreement was not extended. After May 1st, however, Butler was not pressed; he was given time to make good his promise to produce the guaranty of a new corporation with a capital of $250,000. This he could not and did not do; he was in default after May 1st. He then tried to get the Filene Company to accept the guaranty of the Butler Company. This the Filene Company would not do, for the reason that the Butler Company was not good enough. Butler's plan now develops to get control of the Gilchrist Company and have that company guarantee the lease, instead of forming a new $250,-000 company. He told Mr. Dunbar that he was forming plans to own or control all, or almost all, of the stock of the Gilchrist Company, and

that he could not complete his plans for a few weeks. He also told Albertson, the manager of the Butler Company, that he was trying to get hold of the stock of Jardine, who owned a large amount of the capital of the Gilchrist Company, in order to have that company guarantee the lease, and that "he proposed to get Filene to take the guaranty of the Gilchrist Company and that Filene said that would be satisfactory." On May 15th, the record shows that Mr. Dunbar had an interview with Mr. Weed, counsel for Butler, in which Dunbar stated that Butler wanted to have his company and the Gilchrist Company on the lease, and at that time or a little later, Mr. Dunbar suggested to Mr. Weed that a preamble reciting that the lease might have some interest for the Gilchrist Company ought to be prepared, and that he would prepare it. On May 21st, Butler secured Jardine's stock, amounting to 450 shares, whereby he acquired a majority of the shares of the Gilchrist Company and the control of the corporation. Up to this time, Jardine, as well as Ferris, had been opposed to the project of the lease; and Butler appears to have acquired Jardine's stock in order that, having obtained control of the Gilchrist Company, he might secure a guaranty of the lease which would be satisfactory to the Filene Company.

Butler carried out his plan by putting his attorney, Myrick, into the place of Jardine as one of the three directors of the Gilchrist Company, and in that way secured the action of the directors. It is not necessary to discuss what the directors did in the alleged meeting of directors.

Late in May, Butler had an interview with Ferris in which he told him that he had decided to take the lease, and it was necessary that the Gilchrist Company should guarantee it; that there was a question whether such guaranty would be ultra vires, and that a paper was to be drawn up by the Filene Company, showing the benefits which the Gilchrist Company would gain, in guaranteeing the lease. It appears that he was thus carrying out the suggestion of Mr. Dunbar, counsel for the Filene Company, that such paper was necessary.

It appears, then, that the learned and accomplished legal adviser of the claimant found it for the benefit of his client to suggest that the special advantages which the Gilchrist Company might expect to come to it from the guaranty of the lease should be put in as clear light as possible. The attempt to forsee and escape the charge of ultra vires was, then, a safety device for which the Filene Company is entitled to full credit.

Ferris held that the guaranty was an outrage and that he would not sign it. Butler replied: "There will be a way out of that. We will overcome that." Mr. Dunbar, Filene's counsel, prepared the draft of the lease and of the guaranty of the Gilchrist Company, the draft of agreement underneath the guaranty as contained on the original lease, a draft of an agreement between the Gilchrist Company and the Butler Company, and drafts of votes for the Gilchrist Company directors and for the Butler Company directors.

The record shows that these papers were all sent to Mr. Weed, Butler's counsel, late in May. There is evidence that Butler expressed the

belief that there was some special advantage to the Gilchrist Company in having the opposite corner occupied by a "friendly competitor" and having three concerns under a unity management, and here the scheme of "friendly competition" first appears in the landscape. It does not appear that Butler's belief was expressed until after he had failed to get his new $250,000 corporation, and found it necessary to get control of the Gilchrist Company, in order to have it act as guarantor.

The evidence tends to the conclusion that Butler, deeply interested in getting the guaranty of the Gilchrist Company, was using the credit of the Gilchrist Company for his own personal advantage, and was not in good faith seeking to get "special advantages" for the Gilchrist Company, by the guaranty of the lease.

[3] After a study of the whole record we are of the opinion that the claimant has fallen far short of proving, by a preponderance of the evidence, that the execution of the lease was incidental or auxiliary to the main business of the corporation and necessary or expedient to the protection, care and management of the Gilchrist Company. We think the District Court was clearly right in its conclusion, and in putting its decision upon Davis v. Old Colony Railroad, 131 Mass. 258, 259, 275, 276, 41 Am. Rep. 221. In that case the defendant sought to guarantee the payment of the expenses of holding "a world's peace jubilee and international musical festival" in Boston. The ground of the guaranty was the increase in the number of passengers and the amount of business that would result to the railroad. It was urged by the defendant that special advantage would come to it from holding the festival, by increasing its business. The court held the agreement ultra vires, and, in speaking for the court, Chief Justice Gray said:

"A corporation has power to do such business only as it is authorized by its act of incorporation to do, and no other. It is not held out by the government, nor by the stockholders, as authorized to make contracts which are beyond the purposes and scope of its charter. It is not vested with all the capacities of a natural person, or of an ordinary partnership, but with such only as its charter confers. If it exceeds its chartered powers, not only may the government take away its charter, but those who have subscribed to its stock may avoid any contract made by the corporation in clear excess of its powers. If it makes a contract manifestly beyond the powers conferred by its charter, and therefore unlawful, a court of chancery, on the application of a stockholder, will restrain the corporation from carrying out the contract; and a court of common law will sustain no action on the contract against the corporation. * * *

"The holding of a 'world's peace jubilee and international musical festival' is an enterprise wholly outside the objects for which a railroad corporation is established; and a contract to pay, or to guarantee the payment of, the expenses of such an enterprise, is neither a necessary nor an appropriate means of carrying on the business of the railroad corporation, is an application of its funds to an object unauthorized and impliedly prohibited by its charter, and is beyond its corporate powers. Such a contract cannot be held to bind the corporation, by reason of the supposed benefit which it may derive from an increase of passengers over its road, upon any grounds that would not hold it equally bound by a contract to partake in or to guarantee the success of any enterprise that might attract population or travel to any city or town upon or near its line. * * * *"

It appears that the judgment in that case related to a public service corporation; but the court said:

"The same reasons are no less applicable to manufacturing and trading corporations, established under general laws, and the purposes of which are required by those laws to be stated in their articles of association. * * *" Tod v. Kentucky Union Land Co. (C. C.) 57 Fed. 47; Central Trans. Co. v. Pullman, etc., Co., 139 U. S. 24, 58, 11 Sup. Ct. 478, 35 L. Ed. 55.

In the case before us, the evidence in the record clearly tends to the conclusion that the Filene Company had knowledge of the guaranty in question, and was familiar with every act leading up to it. An examination of the facts leading to the execution of the guaranty has been of assistance to us in coming to the conclusion that the claimant has not proved its case by a preponderance of the evidence.

The decree of the District Court is affirmed, and the appellee recovers its costs in this court.